SMITH v. NORTHERN PAC. R. CO.

(Circuit Court of Appeals, Eighth Circuit. October 16, 1893.)

No. 201.

1. PUBLIC LANDS—GRANTS IN AID OF RAILROADS — RIGHT OF WAY—DEFINITE LOCATION OF ROAD.
   The right of way granted by Act July 2, 1864, (13 Stat. c. 217, § 2, p. 365,) to the Northern Pacific Railroad Company, "to the extent of 200 feet in width on each side of said railroad," is limited to land within 200 feet of the line of the railroad as "definitely fixed" by the map thereof filed by the company May 26, 1873, in conformity with section 3 of the act, and does not attach to land beyond said limits, but within 200 feet of the line of the railroad actually constructed, as against one holding title to such land under a patent from the United States without reservation.

2. SAME—MEANING OF "RAILROAD" AND "RAILROAD LINE."
   No significance is to be attached to the use of the word "railroad" in the grant of said right of way, as distinguished from "railroad line," as used in the grant of lands in aid of the road, for the terms are used interchangeably, as synonymous.

3. SAME—DEVIATION FROM DEFINITE LOCATION.
   The fact that railroads frequently deviate from their lines of definite location, as fixed on their maps, is no ground for inferring that congress intended that the right of way should follow the constructed road, and not the line fixed on the map, for the act, while providing for such deviation by giving the company the right of eminent domain, by its other provisions indicates a purpose to have the railroad actually constructed on the line fixed by the map, and to limit the right of way granted to the 200 feet on each side of that line.

4. SAME—DECISION OF COMMISSIONERS AS TO CONSTRUCTION OF RAILROAD—RES JUDICATA.
   A report that the railroad had been completed in a good, substantial, and workmanlike manner, and as in all other respects required by the act, made by commissioners appointed by the president, under section 4 of the act, to examine and report whether it was ready for the service contemplated, does not operate as a judicial determination of the company's title to the right of way over the land on which the road was constructed, as against one holding such land under a patent issued by the United States without reservation.

In Error to the Circuit Court of the United States for the District of North Dakota.

At Law. Action of ejectment by Patrick R. Smith against the Northern Pacific Railroad Company. A verdict for defendant was directed by the court below, and judgment entered thereon. Plaintiff brings error. Reversed.

H. F. Stevens, for plaintiff in error.

Fred. M. Dudley, (J. H. Mitchell, Jr., on the brief,) for defendant in error.

Before CALDWELL and SANBORN, Circuit Judges, and THAYER, District Judge.

SANBORN, Circuit Judge. The principal question in this case is whether, as against one holding title under a patent of the United States which contains no reservation of right of way to the company, the right of way granted to the defendant, the Northern

Pacific Railroad Company, by the act of congress entitled "An act granting lands to aid in the construction of a railroad and telegraph line from Lake Superior to Puget sound, on the Pacific coast, by the northern route," approved July 2, 1864, (13 Stat. c. 217, p. 365,) attached to a tract of land 200 feet in width on each side of its railroad, as actually constructed, where the railroad, as constructed, crosses the land in question, but the line of its definite location shown on its map filed for that purpose with the secretary of the interior, and accepted by him, does not cross it, but passes about two miles south of it.

The property in controversy is eight lots in the city of Bismarck, in North Dakota, which were a part of an 80-acre tract of land that was entered by John A. McLean, as mayor of that city, in behalf of its inhabitants, under the town-site act, (Rev. St. § 2387,) and was patented to him thereunder July 21, 1879. The corporate authorities of that city subsequently conveyed these lots to Patrick R. Smith, the plaintiff. The 80-acre tract on which these lots are situated was selected as the location for a portion of this town site, and surveyed, prior to June 20, 1872. In the year 1872, the attorney of the Lake Superior & Puget Sound Land Company—the company that first made this selection—commenced, and thereafter continued, to sell lots upon this town site according to a plat thereof which was then made, and subsequently, on February 9, 1874, recorded in the office of the register of deeds of the county in which the land was situated. By the 1st of January, 1873, 30 buildings had been erected on the town site, and from that time until the patent was issued the population of the city, and the improvements in it, continued to increase. It was upon the town site thus selected, and the plat thus made, which were afterwards adopted as the plat and site of the city of Bismarck, that the patent to McLean was based, and it contained no reservation of any right of way to the Northern Pacific Railroad Company.

On February 21, 1872, the Northern Pacific Railroad Company filed in the department of the interior the map of its general route east of the Missouri river. This route passed about three-quarters of a mile south of this 80-acre tract. On May 26, 1873, it filed with the secretary of the interior, and he accepted, its map fixing the definite location of its line. The line thus fixed passed about two miles south of this 80-acre tract. During the year 1872, grading was done by the company on this line, extending, in a continuous line, from its grading east of the township in which this tract was located to a point one-quarter of a mile west of the west line of this 80-acre tract extended south to its intersection with the grading. During the year 1872, there was a line staked out across this tract substantially where the railroad is now constructed, but no grading was done on this line until the spring of 1873. In the year 1873 the railroad was constructed across this tract, and has since remained and been operated upon it. The grading on its line of definite location, two miles south, was abandoned. The lots in question are within 200 feet of the main track of this railroad, as actually constructed, and more than two miles from its line of

definite location, as shown on its map filed to definitely fix this line. Upon these facts, the court below instructed the jury that the lots were subject to the right of way of the company, and directed a verdict in its favor on that ground.

Section 2 of the charter of the Northern Pacific Railroad Company provides:

"That the right of way through the public lands be, and the same hereby is, granted to said Northern Pacific Railroad Company, its successors and assigns, for the construction of a railroad and telegraph as proposed; * * * said way is granted to said railroad to the extent of two hundred feet in width on each side of said railroad where it may pass through the public domain, including all necessary ground for station buildings, workshops, depots, machine shops, switches, side tracks, turntables, and water stations." 13 Stat. c. 217, p. 367.

Section 3 of this charter contains a grant of the company of—

"Every alternate section of the public lands, not mineral, designated by odd numbers, to the amount of twenty alternate sections per mile on each side of said railroad line, as said company may adopt, through the territories of the United States, and ten alternate sections of land per mile on each side of said railroad whenever it passes through any state, and whenever on the line thereof, the United States have full title, not reserved, sold, granted, or otherwise appropriated, and free from preemption or other claims or rights at the time the line of said road is definitely fixed, and a plat thereof filed in the office of the commissioner of the general land office."

Section 4 provides that, whenever the company shall have 25 consecutive miles of its railroad and telegraph line ready for use, the president shall appoint three commissioners to examine it, and, if they find and report that the 25 consecutive miles have been properly constructed—

"Patents of the land as aforesaid shall be issued to the said company, confirming to the said company the right and title to the said lands situate opposite to, and coterminous with, said completed section of said road."

This act was approved July 2, 1864.

That the grants of the right of way, and of the lands in aid of the construction of this railroad, were grants in presenti; that they vested in the company the present right to the lands and easements thus conveyed; that these grants were afloat, and attached to no specific land, until the line of the road was "definitely fixed," and that, whenever the line of the railroad was "definitely fixed," the selection of the lands and of the right of way was thereby made, and the right to lands and easements thus selected vested in the company as of the date of the approval of the charter,—are propositions now too well settled to admit of discussion. Railroad Co. v. Baldwin, 103 U. S. 426; Grinnell v. Railroad Co., Id. 739; Railroad Co. v. Dunmeyer, 113 U. S. 629, 5 Sup. Ct. Rep. 566; St. Paul & P. R. Co. v. Northern Pac. R. Co., 139 U. S. 1, 11 Sup. Ct. Rep. 389; Land Co. v. Griffey, 143 U. S. 32, 12 Sup. Ct. Rep. 362.

It is also well settled that, so far as the land grant is concerned, the line of the railroad was "definitely fixed" by the filing with, and acceptance by, the secretary of the interior of the company's map of its line of definite location. The company thereby exhausted its

right of selection, and so firmly anchored the land grant to this fixed line of its own choosing that it could not thereafter change or vary it, without legislative consent, so as to affect titles accruing thereunder, or in any way affected thereby. Thus, in Van Wyck v. Knevals, 106 U. S. 360, 366, 1 Sup. Ct. Rep. 336, Mr. Justice Field, in delivering the opinion of the court, said:

"The route must be considered as 'definitely fixed' when it has ceased to be the subject of change at the volition of the company. Until the map is filed with the secretary of the interior, the company is at liberty to adopt such a route as it may deem best, after an examination of the ground has disclosed the feasibility and advantages of different lines. But when a route is adopted by the company, and a map designating it is filed with the secretary of the interior, and accepted by that officer, the route is established. It is, in the language of the act, 'definitely fixed,' and cannot be the subject of future change, so as to affect the grant, except upon legislative consent."

In Railroad Co. v. Dunmeyer, 113 U. S. 629, 634, 5 Sup. Ct. Rep. 566, Mr. Justice Miller, in delivering the opinion of the court, said:

"The company makes its own preliminary and final surveys by its own officers. It selects for itself the precise line on which the road is to be built, and it is, in law, bound to report its action by filing its map with the commissioner, or, rather, in his office. The line is then fixed. The company cannot alter it so as to affect the rights of any other party."

And in Land Co. v. Griffey, 143 U. S. 32, 39, 12 Sup. Ct. Rep. 362, Mr. Justice Brewer, delivering the opinion of the court, said:

"The fact that the company has surveyed and staked a line upon the ground does not conclude it. It may survey and stake many, and finally determine the line upon which it will build by a comparison of the cost and advantages of each; and only when, by filing its map, it has communicated to the government knowledge of its selected line, is it concluded by its action. Then, so far as the purposes of the land grant are concerned, is its line definitely fixed; and it cannot thereafter, without the consent of the government, change that line so as to affect titles accruing thereunder."

These decisions seem to be broad enough in terms, and positive enough in language, to settle the question here presented. But it is said that the question now before us involves the limits of a right of way, and that the decisions referred to were rendered in cases involving land grants in aid of the construction of railroads. This is true. But it is not perceived how the line of this railroad can be consistently held to be definitely and unalterably fixed, under the act of congress, by filing its map of definite location, and yet be subject to another and subsequent definite fixing, on a different line, by its actual construction, for this is simply to say that a line which is "definitely fixed" is indefinitely changeable. Nor is it perceived how this act of congress can be held to give the company the power to select and definitely fix one line of railroad for the purposes of its land grant, and another and a parallel line for the purposes of its right of way.

It is said that the grant of the right of way reads, "Said way is granted to said railroad to the extent of two hundred feet in width on each side of said railroad where it may pass through the public domain," while the grant of lands in aid of the construction reads, "to the amount of twenty alternate sections per mile on each side of said railroad line as said company may adopt through the ter-

ritories of the United States, and ten alternate sections of land on each side of said railroad when it passes through any state," and hence that the former grant refers to the constructed railroad, and the latter to the line of definite location on the map. But this argument is hypercritical. It proves too much. It proves that the land grant itself is to be measured from the line of definite location fixed on the map in the territories, and from the constructed railroad in the states, for the grant is of 20 alternate sections "on each side of said railroad line" in the territories, and 10 alternate sections "on each side of said railroad" in the states. The fact is that the words "railroad" and "railroad line" are here used interchangeably, as synonymous terms, and no special significance attaches to the use of the one or the other.

It is said that the completed railroads frequently deviate from their lines of definite location, as fixed upon their maps, on account of unforeseen obstacles to construction; that congress must have known this fact, and must have intended that this right of way should follow the constructed road, and not the line fixed upon the map. Conceding the existence of the fact of the frequent deviation of railroads from their fixed lines, and that congress was aware of this fact, it made ample provision for this deviation in section 7 of the act, by giving to this company the power of eminent domain. The company was given the power to condemn its right of way, whenever it desired to deviate from its fixed line. On the other hand, there are many provisions in this act that indicate that it was the purpose of congress to have the railroad actually constructed on the line the company fixed by this map, and to limit the right of way granted to the 200 feet on each side of that line. It was in the contemplation of congress, when this act was passed, that this company would first file a map showing its general route; that upon the filing of this map the lands within 40 miles of the route thus indicated should be withdrawn from entry for homesteads, from pre-emption, and from sale by the government, until the company could survey, select, and definitely fix the line on which it proposed to build its railroad. Section 6. The company filed the map of its general route through Dakota territory, east of the Missouri river, in February, 1872, but it did not file its map of the definite location of its line until May, 1873. Why was this delay contemplated, and why was the line of the railroad required to be "definitely fixed" by a public record made and filed by the company? In our opinion, there were at least three objects to be accomplished by the filing of this map: First, that there might be a public and permanent record of the fixed line of this railroad, and thus of the limits of its right of way; second, that the definite location of the line of the railroad might be known to the secretary of the interior, and furnish the call for his adjustment of the land grant; and, third, that the date of the filing of this map might furnish a date for the determination of the validity of pre-emption, homestead, and other rights. If the sole or main purpose of the map of this line of definite location was to furnish a call for the land grant, or a date for the determination of the validity of rights that had accrued,

and it was the intention of congress that the railroad, when actually constructed, and the right of way granted, might be located elsewhere, no accurate survey, no great delay, was necessary. 'The exact limits of the land grant 20 miles distant from the line of the railroad were of little importance. They might have been fixed without material loss to the company by any engineer, without leaving his office, by drawing a straight line upon a map of the country from some fixed point upon the Red River of the North to another on the Missouri river, and certifying that as the fixed line of the railroad. But the main purpose of requiring this line to be definitely fixed was not only to furnish a call for the land grant, but also to provide a permanent record of the line of the railroad, and the limits of this right of way. Hence it was that some delay in definitely fixing the line was contemplated. Congress intended that the engineers of the company should have ample opportunity to carefully survey the practicable lines of construction along the general route, to discover any obstacles to the construction of the road on these lines, and avoid them, and, when all this was done, that the company should definitely fix its line of railroad; that it should irrevocably choose, and, by filing its map of definite location, announce its choice of, the line on which it elected to construct its road, and along which it would exercise the right of way, and the right to the necessary ground for station buildings, workshops, depots, machine shops, switches, side tracks, turntables, and water stations granted to it. It was vital to the success of the enterprise that the limits of this right and the location of these grounds should be carefully selected. A line of construction definitely fixed without careful preliminary surveys might be ruinous to the company. All this the company, undoubtedly, fully appreciated. It appreciated the purpose and effect of definitely fixing this line. It took ample time to make experiments and accurate surveys of many lines, and to make a careful and wise selection. It did not file its map showing the definite location of its line until May, 1873,—until more than a year after its general route had been selected. It did not file this map until after it had carefully chosen and surveyed its line, and partially graded its railroad upon it, past the town site on which the lots in question are situated. This selection was made by its own officers, in its own time, after every opportunity had been afforded it to make a satisfactory choice; and we think it exhausted the right of selection given by the act of congress, and definitely and irrevocably fixed the line of this railroad, and the limits of the right of way granted to it, as against third parties holding under patents of the United States.

It is said that the decision and report of the commissioners appointed under section 4 of the act, that the railroad and telegraph line of the defendant had been completed in a good, substantial, and workmanlike manner, and as in all other respects required by the act, and the approval of that report by the president, constitute a judicial determination that this railroad was constructed where it should be; that this is the decision by a special tribunal of a matter confided to it; that it cannot be attacked

collaterally; and that, as the United States have waived all objection to the location of the constructed road, the plaintiff, holding under them, cannot attack it.   But the question now presented is, not whether the railroad company had 25 consecutive miles of railroad and telegraph line ready for the service contemplated when these commissioners reported, but whether the right of way granted to the defendant was limited to the 200 feet in width on each side of the line of railroad "definitely fixed" by its map, and partially graded, or whether it extended over a tract 200 feet in width on each side of the line of railroad on which it is now operating,—two miles north of, and parallel to, its fixed line.   This question never was confided to the commissioners for their determination, and never was decided by them.   The question they were authorized to consider and determine was whether or not the railroad and telegraph line were constructed in a substantial and workmanlike manner, so that they would be serviceable for the purposes of their construction; whether they were "ready for the service contemplated;" not whether the title of the company to the lands on which they were constructed was obtained by the grant of the right of way, or by the exercise of the power of eminent domain, or had not been obtained at all.   Moreover, if there was any commissioner or tribunal charged with the duty of determining the question now presented, it was the commissioner of the general land office, and his issuance of the patent to the land in dispute to the plaintiff's grantor, without any reservation of the right of way to the defendant, would be a conclusive adjudication that these lands were not subject to any such right of way.   Quinby v. Conlan, 104 U. S. 420; Smelting Co. v. Kemp, Id. 636.   It is unnecessary to consider, in this case, what effect, if any, the action of the commissioners who examined this railroad, and of the president who approved their report, would have, if the question regarding this right of way arose between the company and the United States, alone, and we express no opinion upon that question.   But as against this plaintiff, holding under a patent issued by the United States to his grantor without any reservation, when the public record made by the company of the definite location of its line two miles south of this land remained unchanged and without amendment, we are clearly of the opinion that such action was without any effect.

It is said that the right of way granted by this act should be held to extend for 200 feet on each side of the center line of the main track of the railroad, as originally constructed.   It is not claimed that this right of way has been swung to the north and to the south from time to time, as the company has since changed its main track, as it must frequently have done, especially in large cities, where it has many tracks.   It is not claimed that the company has ever amended its map of the definite location of its line to show where the line originally constructed was, or that there is any public record anywhere from which its location, and the limits of this right, can be learned.   The only way these can be discovered now is from the testimony of the few witnesses who have knowledge of where the main track was laid 20 years ago, and the death of

these witnesses will soon compel a resort to evidence still less reliable. Lots and lands in this country are bought and sold on the faith of the public records. If this right of way is not anchored to the line fixed by the map of this company, the record of that map must prove a constant snare to purchasers of lands near this railroad. It is no answer to this position to say that the railroad is visible on the land it traverses, because it is common knowledge that lands are frequently bought and sold without a view of the premises, and because no view of the premises now could determine where the main track was 20 years ago. We are unable to persuade ourselves that congress ever intended to leave the location and limits of this right of way so undefined and undefinable.

After the most careful consideration of this case, we are unable to find any reason for the rule adopted by the supreme court, that the line "definitely fixed" by the map furnishes the only call for the adjustment of the land grant, that is not equally cogent and convincing to prove that it also furnishes the call for determining the limits of the right of way. If it does not do so, the filing of the map does not "definitely fix" the line of the railroad at all, but leaves it indefinite, and liable to be changed by the actual construction of the road. It was not essential to the adjustment of the land grant that the line of the proposed road should be definitely fixed after careful surveys, but it was vital to the interests of the company in its right of way, and in its right to grounds for buildings and improvements, that its line should be carefully selected and definitely fixed where the railroad could be economically constructed upon it. Patents issue to the company for the lands granted after the adjustment of the grant, and the map of definite location grows less valuable as a muniment of the title to these lands, but no patents issue for the right of way, and the only record that defines or evidences the limits of that right is this map. It is of paramount importance that there should be a public record, accessible to all, from which the extent and limits of this right may be ascertained. It would be intolerable that so valuable a right should be disconnected, as defendant's counsel claim it is, from the line definitely fixed by the map of the company; should attach itself to the center line of the main track of the railroad as originally constructed, 20 years ago, and should have no muniment of title, but the uncertain memory of witnesses of its construction, to fix its limits.

The result is that as against one holding under a patent of the United States, without reservation, the right of way granted to the Northern Pacific Railroad Company by the act of Congress entitled "An act granting lands to aid in the construction of a railroad and telegraph line from Lake Superior to Puget sound on the Pacific coast by the northern route," approved July 2, 1864, (13 Stat. c. 217, p. 365,) is limited to 200 feet in width on each side of the line of railroad "definitely fixed" by the company's map of definite location filed May 26, 1873, and, as the lots in question were not within these limits, they were not subject to the defendant's right of way, and it was error for the court below to instruct the jury to return a verdict in its favor.

It is unnecessary to notice other assignments of error, because the questions presented by them may not arise on a second trial. The judgment below is reversed, with costs, and the cause remanded, with instructions to grant a new trial.