## ST. PAUL, M. & M. RY. CO. v. SAGE.

### (Circuit Court of Appeals, Eighth Circuit. December 2, 1895.)

### No. 630.

1. RAILROAD AID GRANT—TIME OF TAKING EFFECT.

Lands within the primary limits of a land grant in aid of a railroad are identified, and segregated from the public domain, by the filing with and acceptance by the secretary of the interior of the map of definite location of the line of the railroad in aid of which they are granted, and the grant of these lands then takes effect as of the date of the approval of the act making the grant.

2. SAME—INDEMNITY LANDS.

Lands within the indemnity limits of such a land grant remain the property of the United States, and subject to disposal by them, until such lands are selected by the beneficiary in lieu of lands lost within the primary limits. Lands within the indemnity limits are not reserved until they are either thus selected, or are withdrawn from market by the secretary of the interior, pursuant to the terms of the act.

3. SAME—RESERVATION FROM OPERATION OF GRANT.

Lands within the primary limits of the grant of July 4, 1866 (14 Stat. 87), and within the indemnity limits of the grants of March 3, 1857 (11 Stat. 195), and of March 3, 1865 (13 Stat. 526), which had not been withdrawn from market by the secretary of the interior under the latter acts when the map of the definite location of the line of the Hastings & Dakota Railroad Company was filed with and approved by the secretary of the interior, were not reserved or excepted from the operation of the act of July 4, 1866, granting lands to aid in the construction of the railroad of that company, but passed under that act.

4. SAME—WITHDRAWAL FROM MARKET.

Act March 3, 1865, increasing the quantity of land granted to the state of Minnesota by Act March 3, 1857, to aid in the construction of a railroad by the First Division of the St. Paul & Pacific Railroad Company, provided that, as soon as the governor of the state should file with the secretary of the interior maps designating the routes of said road and branches, it should be the duty of the secretary of the interior to with-

draw such lands from market. *Held*, that the act did not effect such withdrawal in the absence of the filing of a map or any action by the secretary.

5. SAME.

Nor was it the duty of the secretary to withdraw such lands from market until the governor filed maps as required by the act.

6. SAME.

The fact that in 1857 a map was filed in the land office designating the line of the road was immaterial, the commissioner having refused to accept such designation because the lands were not surveyed, and the company having acquiesced in such ruling.

7. SAME.

Since Act March 3, 1865, expressly required the filing of maps designating the route of the railroad, and in view of the facts that the commissioner had notified the railroad company in 1857 that no action could be taken as to a part of the line on the map filed in that year until a supplemental map was filed, and the company had notified the commissioner that it intended to change this part of its route, and he consented to such change, a letter written in June, 1865, by the governor of the state to the secretary of the interior, asking whether it was necessary to again file maps of the land pertaining to that part of the route, and stating that, if it was not necessary, he requested the withdrawal of the lands designated upon such map previously filed, could not be considered as an adoption by him of this map, nor did it impose on the secretary any duty to withdraw the lands exhibited by it on that part of the route.

8. SAME—DUTIES OF COMMISSIONER.

It is within the powers and duties of the commissioner of the land office to determine whether the railroad was located in good faith on as direct a line as the topography of the country would permit, or was unnecessarily deflected to increase the land grant.

9. SAME—ACQUIESCENCE IN COMMISSIONER'S DECISION.

A company which accepts a ruling rejecting its map of definite location, and 6 years later agrees with the officers of the land department that its line is not definitely fixed by the filing of the rejected map, and receives permission to relocate its line and change its terminus on that account, without legislation, cannot, after its own and conflicting land grants have been administered with this view for more than 20 years, insist that its line was definitely fixed by the filing of its rejected map, on the ground that the error of the commissioner could not affect its rights.

Appeal from the Circuit Court of the United States for the District of Minnesota.

M. D. Grover and George B. Young (T. R. Benton was with them on the brief), for appellant.

J. M. Gilman (Owen Morris was with him on the brief), for appellee.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

SANBORN, Circuit Judge. This is an appeal from a decree which dismissed a bill brought by the St. Paul, Minneapolis & Manitoba Railway Company to establish its equitable title to, and to obtain a conveyance of, about 26,000 acres of land in the state of Minnesota, the legal title to which is held by Russell Sage, the appellee, as trustee. The title of the appellee is derived from the act of congress of July 4, 1866 (14 Stat. 87), by which there was granted to the state of Minnesota, for a railroad from Hastings, through the counties of Dakota, Scott, Carver, and McLeod, to such point on the western

boundary of the state as the legislature of the state might determine, every alternate section of land, designated by odd numbers, to the amount of five alternate sections per mile on each side of said road, together with the right to select indemnity lands within 20 miles of the line of the road.   The lands in dispute are within the place limits of this grant.   The Hastings & Dakota Railway Company built the railroad for which this grant was made, and, through acts of the legislature of Minnesota, acquired the right to all the lands and privileges bestowed upon that state to aid in its construction.   On January 4, 1867, this railway company filed a map of the definite location of its line of railroad with the secretary of the interior, and on June 26, 1867, he approved it.   The appellee has succeeded to all the title to these lands which this railway company acquired.   It is conceded that these lands were identified and segregated from the public domain by the filing and approval of this map of the definite location of this line of railroad, that the grant then took effect as of the date of the act, and that both the legal and equitable title to them passed to the appellee, unless they were excepted from the grant by the last proviso of section 1 of the act, which reads:

"And provided further, that any and all lands heretofore reserved to the United States by any act of congress, or in any other manner by competent authority, for the purpose of aiding in any object of internal improvement, or other purpose whatever, be, and the same are hereby, reserved and excepted from the operation of this act, except so far as it may be found necessary to locate the route of said road through such reserved lands, in which case the right of way shall be granted provided the United States has yet in possession the title thereto."   14 Stat. 87.

The claim of the appellant is that, at the date of this grant, these lands had been reserved to the United States for one of the beneficiaries of the acts of congress of March 3, 1857 (11 Stat. 195), and March 3, 1865 (13 Stat. 526), and that it has succeeded to the rights of that beneficiary.   This claim presents two questions, viz.: First. Were these lands so reserved on July 4, 1866, or at any time prior to June 26, 1867, when the line of the Hastings & Dakota Railway Company was definitely fixed?   Second. If they were so reserved, has the appellee succeeded to the right to them then held by the beneficiary under the acts of 1857 and 1865?   It is obvious that if the first question must be answered in the negative, that answer will be decisive of this case, and we will accordingly first consider it.   The act of March 3, 1857, provides:

"That there be and is hereby granted to the territory of Minnesota, for the purpose of aiding in the construction of railroads, from Stillwater, by way of Saint Paul and Saint Anthony, to a point between the foot of Big Stone Lake and the mouth of Sioux Wood river, with a branch via Saint Cloud and Crow Wing to the navigable waters of the Red River of the North, at such point as the legislature of said territory may determine, * * * every alternate section of land, designated by odd numbers, for six sections in width on each side of each of said roads and branches; but in case it shall appear that the United States have, when the lines or routes of said roads and branches are definitely fixed, sold any sections, or any parts thereof, granted as aforesaid, or that the right of pre-emption has attached to the same, then it shall be lawful for any agent, or agents, to be appointed by the governor of said territory or future state to select, subject to the approval of the secretary of the interior, from the lands of the United

States nearest to the tiers of sections above specified, so much land, in alternate sections, or parts of sections, as shall be equal to such lands as the United States have sold or otherwise appropriated, or to which the rights of pre-emption have attached, as aforesaid; which lands * * * shall be held by the territory or future state of Minnesota for the use and purposes aforesaid; provided, that the land to be so located shall, in no case, be further than fifteen miles from the lines of said roads or branches, and selected for and on account of each of said roads or branches." 11 Stat. 195, 196.

The act of March 3, 1865, provided that the quantity of lands granted to the state of Minnesota by the act of March 3, 1857, should be increased to 10 sections per mile for each of the railroads and branches therein mentioned, "subject to any and all limitations contained in said act and subsequent acts, and as hereinafter provided," and that the proviso above quoted should be so amended as to read as follows, to wit:

"Provided, that the land to be so located shall, in no case, be further than twenty miles from the lines of said roads and branches, to aid in the construction of each of which said grant is made; and said lands granted shall, in all cases, be indicated by the secretary of the interior." 13 Stat. 526, §§ 1, 2.

The act of 1857 contained no provision for the withdrawal from market of any of the lands referred to therein. But section 7 of the act of 1865 provided:

"That as soon as the governor of the said state of Minnesota shall file or cause to be filed with the secretary of the interior maps designating the routes of said roads and branches, then it shall be the duty of the secretary of the interior to withdraw from market the lands embraced within the provisions of this act."

None of the lands here in question fall within the place limits of the grant of 1857 or of 1865, but 1,320 acres of them fall within the indemnity limits of 15 miles fixed by the act of 1857, and the remainder of them fall without the limits of 15 miles and within the limits of 20 miles fixed by the act of 1865. The secretary of the interior never in fact withdrew from market any of these lands under the act of 1857 or under the act of 1865, before the line of the railroad of the Hastings & Dakota Railway Company was, on June 26, 1867, definitely fixed, and its rights to them attached under the act of July 4, 1866. But the appellant contends, nevertheless, that these lands were reserved before the passage of that act by virtue of the existence of the following facts:

The legislative assembly of the territory of Minnesota, by an act approved May 22, 1857 (Sp. Laws 1857 [Ex. Sess.] c. 1), fixed the terminus of the main line of the railroad provided for by the act of March 3, 1857, at Breckenridge on the Sioux Wood river, fixed the terminus of the branch line at St. Vincent near the mouth of Pembina river, incorporated the Minnesota & Pacific Railroad Company, authorized it to construct and operate these railroads, and granted to it all the interests of the territory and future state of Minnesota in the lands granted and rights and privileges conferred to aid in the construction of these railroads by the act of 1857. During the summer of that year the Minnesota & Pacific Railroad Company surveyed and marked on the ground the main line of this railroad from Still-

water to a point on the Sioux Wood river about six miles south of Breckenridge, and on December 5, 1857, it filed a map of this line in the office of the commissioner of the general land office. The public surveys had then been made along this line to the west line of range 38, but no further. The lands in question in this suit lie west of range 38. Upon receipt of this map, the commissioner suspended action upon that portion of the line shown upon it east of the west line of range 38 until its wide deflection from a direct line from St. Anthony to Breckenridge should be explained, and as to the portion of the line west of range 38 he wrote to the agent of the territory and of the railroad company, who filed the map:

"No action can of course be taken by this office in regard to this part of the road, until the public surveys have advanced coextensive with the route of the road and a supplemental map shall be filed exhibiting this portion in connection with the public surveys."

The railroad company submitted to this ruling without objection, prepared proofs which explained the deflection of the line east of range 39, and after they were filed with the commissioner, and about May 8, 1858, the map of the line east of range 39 was approved by the secretary of the interior, and he withdrew from market the odd sections east of that range within 15 miles of the line of the railroad as it was shown upon this map, but he took no further action with reference to that portion of the line west of range 38 and the lands appurtenant thereto. The public surveys were not extended over the lands lying along this line west of range 38 until 1867, 1868, and 1869, and then the deputy surveyors of the United States described the line, as it was staked upon the ground, and as it was shown by this map, in their field notes and plats of the surveys, and noted the distance of this line from the corners of the sections through which it extended. In 1864 the First Division of the St. Paul & Pacific Railroad Company had succeeded to the interest of the Minnesota & Pacific Railroad Company in these railroads and lands, and on May 8, 1864, its president wrote to the commissioner of the general land office that it desired to relocate the line of its railroad from range 38 to its western terminus, and to change that terminus from the mouth of Sioux Wood river to the foot of Big Stone Lake; that, as this portion of the line ran through unsurveyed lands, he supposed the department would not object to this change, and he inquired if legislative action would be necessary to authorize it. On May 25, 1865, the commissioner replied that, inasmuch as the department had, in 1858, refused to accept the survey of this line west of range 38, there would be no objection to the change, provided the company withdrew its claim to the lands along that part of its route as shown on the map of 1857. In June, 1865, the governor of the state of Minnesota, at the request of the First Division of the St. Paul & Pacific Railroad Company, called the attention of the secretary of the interior to the fact that the route of this railroad shown on the map of 1857 had been approved by his department to the west line of range 38 and no further, inquired of him whether or not it would be necessary to again file maps of the line of this railroad in order to obtain a withdrawal of the lands embraced within the provisions

of the act of March 3, 1865, and requested, if it was not necessary to do so, that the secretary would withdraw the lands embraced within the provisions of that act without the filing of other maps. The commissioner adhered to his former ruling, that no action could be taken on the line west of range 38 without the filing of a supplemental map, withdrew the lands east of range 39 covered by the act of March 3, 1865, but did not withdraw any of the lands west of range 38. The line of the Hastings & Dakota Railway Company, it will be remembered, was definitely fixed through the lands here in question on June 26, 1867. On April 22, 1868, the secretary of the interior withdrew from market these and all other odd-numbered sections within 20 miles of its fixed line for the benefit of the Hastings & Dakota Railway Company. On April 16, 1868, the First Division Company wrote to the commissioner of the general land office that certain townships along its route west of range 38 had been surveyed, and requested him to take such action as to protect the company in its rights to all lands along its route. On May 4, 1868, the commissioner replied that if the company and the governor of Minnesota would officially accept the line laid down by the surveys of the United States on certain township plats as the line of definite location of the railroad, and would file such acceptance in the office of the commissioner, an immediate withdrawal of the lands granted by the acts of 1857 and 1865 to the extent of the surveys would be ordered. The company subsequently caused maps of the definite location of its line from range 38 west to Breckenridge to be filed. The line shown on these maps is the same as that shown on the map of December, 1857, to a point 6 miles south of Breckenridge, but it extends to that town, a point 6 miles beyond the terminus of the original line. On August 14, 1868, and on May 25, 1869, the commissioner withdrew from market the lands along this line west of range 38 for the First Division Company. The Hastings & Dakota Company and the First Division Company duly constructed and operated their respective railroads, and each claimed the lands in question. The former insisted that these lands constituted a part of its granted lands under the act of July 4, 1866. The latter, and its successor, the St. Paul, Minneapolis & Manitoba Railway Company, the appellant, selected these lands on February 19, 1880, to supply deficiencies claimed to exist within the place limits of the grant of 1857 and of 1865, and claimed them as a part of its indemnity lands. The issues between these companies were tried before the commissioner of the general land office and the secretary of the interior, and were determined in favor of the Hastings & Dakota Company. Thereupon the lands were certified to the state of Minnesota for that company, and were subsequently conveyed by the state to the appellee, who had succeeded to its rights.

The lands in question were within the primary limits of the grant of July 4, 1866, to the Hastings & Dakota Railway Company. The line of that road was definitely fixed on June 26, 1867. Unless these lands were excepted from that grant because they were then "reserved to the United States by any act of congress, or in any other manner by competent authority, for the purpose of aiding in any

object of internal improvement, or other purpose whatever" (14 Stat. 87, § 1), they passed by that grant to the Hastings & Dakota Company. The filing and approval of its map of definite location identified and segregated them from the public domain, and the grant of them then took effect as of the date of the act of congress which bestowed it. Smith v. Railroad Co., 7 C. C. A. 397, 406, 58 Fed. 513; U. S. v. Winona & St. P. R. Co., 15 C. C. A. 96, 67 Fed. 948, 966; Railroad Co. v. Baldwin, 103 U. S. 426; Grinnell v. Railroad Co., Id. 739; Railway Co. v. Dunmeyer, 113 U. S. 629, 5 Sup. Ct. 566; St. Paul & P. R. Co. v. Northern Pac. R. Co., 139 U. S. 1, 11 Sup. Ct. 389; Land Co. v. Griffey, 143 U. S. 32, 12 Sup. Ct. 362.

These lands were not within the place limits, but were within the indemnity limits of one or the other of the grants of March 3, 1857, and of March 3, 1865, to the predecessors of the appellant; but they had not been selected by any of the beneficiaries of these grants when the grant of July 4, 1866, took effect. Unless they had been withdrawn from market under the provisions of section 7 of the act of 1865, they were not reserved for either of the predecessors in interest of the appellant. "Until selection was made, the title remained in the government, subject to its disposal at its pleasure." U. S. v. Winona & St. P. R. Co., 15 C. C. A. 96, 67 Fed. 948, 967; Kansas Pac. R. Co. v. Atchison, T. & S. F. R. Co., 112 U. S. 414, 421, 5 Sup. Ct. 208; Barney v. Railroad Co., 117 U. S. 228, 232, 6 Sup. Ct. 654; Sioux City & St. P. R. Co. v. Chicago, M. & St. P. Ry. Co., 117 U. S. 406, 408, 6 Sup. Ct. 790; Wisconsin Cent. R. Co. v. Price Co., 133 U. S. 496, 511, 10 Sup. Ct. 341; U. S. v. Missouri, K. & T. Ry. Co., 141 U. S. 358, 371, 12 Sup. Ct. 13; Railroad Co. v. Forsythe, 15 Sup. Ct. 1020, 1023; Ryan v. Railroad Co., 99 U. S. 382; Railroad Co. v. Herring, 110 U. S. 27, 38, 39, 3 Sup. Ct. 485.

It is conceded that these lands had never been withdrawn from market by any act of the secretary of the interior or of any of the officers of the land department, as required by the seventh section of the act of March 3, 1865. The contention of counsel for the appellant, however, is that, by virtue of the facts we have recited, they were in legal effect withdrawn from market, and thus reserved to the United States to aid in the construction of the railroads of the appellant before the act of July 4, 1866, took effect. They base this contention upon two propositions: First, that the act of March 3, 1865, was in itself a statutory withdrawal of the lands; and, second, that if it was not, it imposed upon the secretary of the interior the absolute duty to withdraw them before the act of July 4, 1866, took effect, and that the wrongful omission of a public officer charged with the administration of the law to discharge an absolute duty imposed upon him thereby cannot prejudice the rights of their client.

A careful perusal of the act of 1865 is sufficient to dispose of the first proposition. That act was both a law and a contract. It was a contract between the United States, the state of Minnesota, and the First Division of the St. Paul & Pacific Railroad Company. It provided that:

"As soon as the governor of the state of Minnesota shall file or cause to be filed with the secretary of the interior maps designating the routes of said

roads and branches, then it shall be the duty of the secretary of the interior to withdraw from market the lands embraced within the provisions of this act."

Attempted judicial construction of the unequivocal language of a statute or a contract serves only to create doubt and to confuse the judgment. There is no safer or better settled canon of interpretation than that, when language is plain and unambiguous, it must be held to mean what it plainly expresses, and no room is left for construction. Knox Co. v. Morton, 15 C. C. A. 671, 68 Fed. 787, 789; U. S. v. Fisher, 2 Cranch, 358, 399; Railway Co. v. Phelps, 137 U. S. 528, 536, 11 Sup. Ct. 168; Bedsworth v. Bowman, 104 Mo. 44, 49, 15 S. W. 990; Warren v. Paving Co., 115 Mo. 572, 576, 22 S. W. 490; Davenport v. City of Hannibal, 120 Mo. 150, 25 S. W. 364. It was competent for congress to have provided that the lands embraced within the provisions of this act should be, and were, withdrawn from market by the passage of the act. They did not so enact, and no argument or illustration can make it clearer that they did not intend so to do than the apt and forceful language of the act itself, that as soon as the governor shall file the maps, then the secretary shall withdraw the lands. To hold that this effected a withdrawal of these lands without the filing of a map, or the action of the secretary, would be judicial legislation of a character too radical for us to undertake to enact.

As to the second proposition, it may be conceded that one who diligently prosecutes and consistently demands his right, and does all that the law requires him to do to assert and protect it, cannot be deprived of it by the wrongful omission of the officer charged with the administration of the law to discharge an absolute duty imposed upon him thereby. Lytle v. Arkansas, 9 How. 314, 333; Shepley v. Cowan, 91 U. S. 330, 338. But it goes without saying that one who would invoke this principle must be without fault or negligence himself. He must diligently and consistently demand his right. He must have performed every act that he could himself perform to protect and enforce it under the law or contract upon which he relies, and he must have placed and have maintained himself in a position in which he had the right to demand of the officer the discharge of his duty. His waiver of his right to demand its discharge, his consent or agreement that it shall not be discharged, his election to accept benefits or privileges that result from the failure to discharge it, will be fatal to his right to invoke the principle here relied upon. Did the First Division of the St. Paul & Pacific Railroad Company, then, at any time before the act of July 4, 1866, took effect, attain to the position where it had the right to demand of the secretary of the interior a withdrawal from market of these indemnity lands west of range 38 under the act of 1865? That act was, as we have said, a contract between the United States and the First Division Company. It was a contract that, as soon as the governor of Minnesota should file maps designating the route of the main line of its railroad, but not before, the secretary would withdraw these lands. It was as binding and effective a contract that the lands should remain public lands, subject to the disposal

of the United States, at its pleasure, until such maps should be filed, as it was that the lands should be withdrawn as soon as they were filed. In view of this fact, it is a conclusive answer to this claim of the appellant that the governor never did file any such maps until after the United States had granted the lands here in dispute to the Hastings & Dakota Company by the act of 1866. No duty to withdraw the lands could be imposed upon the secretary until such maps were filed. The governor was in reality the agent of the company to file them. It was in its power to cause him to file them at any time after the passage of the act of 1865. It did not do so until after these lands had been granted to the Hastings & Dakota Company by the act of 1866. It was not, therefore, through the failure of the secretary to discharge his duty, after the company had caused the maps to be filed, and had done all in its power to perfect its rights, but it was through the failure of the company itself to have the maps filed, pursuant to the terms of the act and the contract under which it claims, that these lands were not withdrawn from market until they were granted to the Hastings & Dakota Company.

It is argued that, when the act of 1865 was passed, the route of this road was designated, and its line was definitely fixed past these lands by the map of 1857, and that it was the duty of the secretary to withdraw the lands without the filing of any other map. The answer is that such was not the contract. If it could be conceded that the route of this road west of range 38 was designated, or was definitely fixed, by the map of 1857, the presumption would be that the contracting parties all knew that fact in 1865, when the contract of withdrawal was made. They might have agreed, and congress might have enacted, that the secretary should immediately withdraw these lands upon the route designated by that map. It was equally competent for them to agree that these lands should remain as they were, subject to the disposal of the United States, until the governor should at some future time file other maps designating the route of this road. They did not make the former, and they did make the latter, contract. It is not the province of the courts to change it. Moreover, there was good reason for making the latter contract, so far as it relates to that part of this line which lies west of range 38. It was certainly by no means clear from the records of the land department—it evidently was not clear to the parties themselves, in 1865, when this act was passed—that the route upon which the First Division Company intended to build its railroad was designated or definitely fixed west of range 38 by the map, of 1857. When that map was filed the commissioner of the general land office had suspended action on that part of the line shown by it east of range 39, because of its wide deflection from a direct line from St. Anthony to Breckenridge, and had informed the company that, of course, no action could be taken on the line on the unsurveyed lands west of range 38 until a supplemental map was filed exhibiting that portion of the line in connection with the public surveys. Conceding that the commissioner could not lawfully reject or refuse

to accept the designation of the line west of range 38, solely on the ground that the lands through which it extended were not surveyed, if the company had insisted upon his acceptance thereof, there is no doubt, we think, that it was within the power, and that it was the duty, of the commissioner to investigate and determine whether or not this railroad was located in good faith on a line as direct as the topography of the country would permit, or was unnecessarily deflected to increase the land grant, and that his ruling suspending action upon this map until this deflection was satisfactorily explained was a rightful exercise of his authority. Butz v. Railroad Co., 119 U. S. 55, 72, 7 Sup. Ct. 100. The railroad company acquiesced in his entire ruling without protest, prepared proofs that the deflection of the line east of range 39 was rendered necessary by the character of the country, obtained the approval of that part of the line in May, 1858, and silently accepted the rejection of the map of that part of the line west of range 38 without question. That portion of the line remained in this situation until 1864, when the president of the First Division Company wrote to the commissioner of the land department that the company desired to relocate its line from range 38 to its western terminus, and to change that terminus from the mouth of Sioux Wood river to the foot of Big Stone Lake; that as this part of the line passed through a district not yet subdivided, he had supposed that the general land office would interpose no objection to its relocation, and he inquired whether the change could be made without further legislation. The commissioner replied that, inasmuch as the department had refused to accept the survey of the line west of range 38, shown on the map of 1857, there would be no objection to its relocation if the company relinquished its claim to the lands along the route shown on the map of 1857. Under the land-grant acts, a line of railroad becomes definitely fixed when the beneficiary no longer has the right to change it without legislative action. Walden v. Knevals, 114 U. S. 373, 374, 5 Sup. Ct. 898. The commissioner then had refused to accept the map of 1857 as a map of the definite location of this line west of range 38, and the company had acquiesced in that ruling. In 1864 the contracting parties under the act of 1857 had agreed in the opinion that that part of the line west of range 38 was not definitely fixed by the filing of that map, that the company might relocate it without legislation, and the company had given notice that it desired so to do. This was the condition of this part of the line when the act of 1865 was passed, and it certainly furnishes ample reason for the provision of that act that the governor should file another map designating the route on which the company intended to build before the secretary should withdraw the land.

Moreover, we are unable to reach the conclusion that that portion of this line of road west of range 38 was definitely fixed by the proceedings to which we have referred. The line of a railroad under any one of these acts granting lands in aid of its construction undoubtedly becomes fixed by the filing and acceptance, or the

filing and receipt without objection, of its map of definite location. Van Wyck v. Knevals, 106 U. S. 360, 366, 1 Sup. Ct. 336; Walden v. Knevals, 114 U. S. 373, 5 Sup. Ct. 898; Barney v. Railroad Co., 117 U. S. 228, 6 Sup. Ct. 654; Railway Co. v. Dunmeyer, 113 U. S. 629, 5 Sup. Ct. 566; Buttz v. Railroad Co., 119 U. S. 55, 7 Sup. Ct. 100; St. Paul & P. R. Co. v. Northern Pac. R. Co., 139 U. S. 1, 18, 11 Sup. Ct. 389.

It may be conceded that the filing of a proper map of the definite location of a line over unsurveyed lands might definitely fix that line, in case the commissioner rejected it on the sole ground that the lands were unsurveyed, and the railroad company immediately and diligently insisted upon its right to have it accepted, objected to or protested against the ruling rejecting it, and consistently maintained that claim. But it cannot, in our opinion, be successfully maintained that a company may accept without a murmur a ruling rejecting its map of definite location, may 6 years later agree with the officers of the land department in the opinion that its line is not definitely fixed by the filing of the map rejected, may on that ground ask and receive from the department permission to relocate its line and change its terminus without legislation, may act upon this assumption for years, and, after its own and conflicting land grants have been administered with this view for more than 20 years, insist that its line was definitely fixed by the filing of its rejected map, on the ground that the error of the commissioner could not affect its rights. This is the case in hand, and it lacks, in our opinion, the elements of diligence and consistency that are essential to warrant the First Division Company or its successor in invoking the principle upon which it relies.

Finally, it is insisted that the letters of the governor of Minnesota in June, 1865, were an adoption of the map of 1857 as a map designating the route of this railroad west of range 38, under the act of 1865, and that his demand in his letter of June 7, 1865, of a withdrawal of the public lands granted by that act to the state of Minnesota to aid in the construction of the railroads imposed upon the secretary the absolute duty to immediately withdraw the lands in dispute. There are two objections to the maintenance of this proposition: First. It was not the contract of 1865 that the secretary of the interior would withdraw these lands when the governor of the state of Minnesota adopted the rejected map on file. That contract was that, as soon as the governor filed maps designating the routes, the secretary should withdraw the lands. This was a condition precedent to the imposition of any duty of withdrawal upon the secretary. The adoption of the old map was not a compliance with this condition. Second. The governor did not specifically adopt the map of 1857 west of range 38, and demand a withdrawal of the lands based upon the line shown by that map. His letter that is said to be an adoption of that line reads:

"Hon. James Harlan, Secretary of the Interior, Washington, D. C.—Sir: I respectfully inclose copy of a communication from George L. Becker, Esq., president First Division St. Paul & Pacific Railroad. In compliance with his request, I respectfully inquire whether it is necessary to again file maps

of certain lands, designated in his said letter of the 2d instant, in order to obtain a withdrawal of the lands embraced within the provisions of the act approved March 3, 1865, and if it is not I have the honor to request the withdrawal of the lands upon the route of said St. Paul & Pacific Railroad and its branches, as designated upon the map already filed in your department.

"Very respectfully, your obedient servant,

"Stephen Miller, Governor of Minnesota."

In view of the facts that the commissioner had notified the railroad company, in 1857, that no action could be taken as to the line west of range 38, on the map filed in that year, until a supplemental map was filed, that the company had notified the commissioner that it intended to change this part of its route, and he consented to the change, and that the act of 1865 expressly required the filing, after its passage, of maps designating the route of this railroad before the lands were withdrawn, it is difficult to find anything in the simple inquiry contained in this letter which adopted the rejected map, or imposed upon the secretary any duty to withdraw the lands upon the route which it exhibited west of range 38. That the commissioner did subsequently withdraw the lands along the portion of the line east of range 39, which had been definitely fixed in 1858, without the filing of a new map of that portion of the route, imposed upon him no duty to withdraw them upon the portion of the line which had been rejected. The provision of the contract that maps designating the routes should be filed after its passage before the secretary should be required to withdraw the lands, was a provision for the benefit of the United States. The governor or the secretary might undoubtedly waive that provision in whole or in part, but neither of them was obliged to waive it, and no duty of withdrawal could be imposed upon them, without their consent, without a full compliance with its terms.

Our conclusion is that the First Division of the St. Paul & Pacific Railroad Company, through its failure to cause the governor of Minnesota to file maps designating that part of the route of its main line west of range 38, did not reach a position in which it had the right to demand from the secretary of the interior a withdrawal of the indemnity lands pertaining to that portion of the line of its railroad west of range 38, under the act of March 3, 1865, before the act of July 4, 1866, took effect, and the grant contained in that act attached to the specific lands here in question by the definite location of its line on June 26, 1867. The lands here in question, therefore, were not withdrawn from market, and were not reserved or excepted from the grant for the Hastings & Dakota Railway Company by the act of July 4, 1866. A consideration of the terms and effect of the latter act lends strong support to the conclusion we have reached. That act was a grant and a law, and its interpretation ought to be such as to effect the intent of congress in its enactment. By its terms congress granted the lands here in question to the state for the Hastings & Dakota Railway Company, excepting from the grant those lands only which were reserved to the United States for the purposes therein stated. By the act of March 3, 1865, congress had provided that, when the First Division Company should file its maps designating the routes of its railroads, the secretary of the interior

should withdraw these lands from market.  They had provided that way, and that way only, for their reservation.  None of these lands had been so reserved when the act of 1866 was passed.  Thereupon, excepting from the grant, not the lands which might be, or might have been, or ought to have been, reserved, but only those already reserved, they granted these lands to the state for the Hastings & Dakota Company.  There seems to be no escape from the conclusion that they intended to reserve from this grant that part of the lands here in question which had been withdrawn from market, by the officer appointed, and in the manner designated, by the act of 1865 for their reservation, and that part only.  As none of these lands had been so withdrawn or reserved, none of them were excepted from the grant.  In Railroad Co. v. Whitney, 132 U. S. 357, 366, 10 Sup. Ct. 112, the supreme court said of the rulings of the officers of the land department:

"It is true that the decisions of the land department on matters of law are not binding upon this court, in any sense.  But on questions similar to the one involved in this case they are entitled to great respect at the hands of any court.  In U. S. v. Moore, 95 U. S. 760, 763, this court said: 'The construction given to a statute by those charged with the duty of executing it is always entitled to the most respectful consideration, and ought not to be overruled without cogent reasons. * * * The officers concerned are usually able men and masters of the subject.  Not unfrequently they are the draftsmen of the laws they are afterwards called upon to interpret.'  See, also, Brown v. U. S., 113 U. S. 568, 571, 5 Sup. Ct. 648, and cases there cited; U. S. v. Burlington & M. R. R. Co., 98 U. S. 334, 341; Kansas Pac. R. Co. v. Atchison, T. & S. F. R. Co., 112 U. S. 414, 418, 5 Sup. Ct. 208."

It is a gratifying fact that the officers of the land department, in their consideration of the questions involved in this suit, reached the same conclusion at which we have arrived.  Mattson v. Railway Co., 5 Land Dec. Dep. Int. 356, 699; St. Paul, M. & M. Ry. Co. v. Hastings & D. Ry. Co., 13 Land Dec. Dep. Int. 440.

The conclusion we have reached upon the first question presented in this case renders the discussion of any other question unnecessary, since the decree below must be affirmed, with costs, whatever our opinion might be upon the other question presented.  It is, accordingly, so ordered.