SOUTHERN PAC. R. CO. et al. v. UNITED STATES.

UNITED STATES v. SOUTHERN PAC. R. CO. et al.

(Circuit Court of Appeals, Ninth Circuit.   May 20, 1901.)

Nos. 584, 588.

1. PUBLIC LANDS—GRANT TO SOUTHERN PACIFIC RAILROAD COMPANY—SCOPE OF GRANT OF 1871.

The proviso attached to the grant of lands to the Southern Pacific Railroad Company for the construction of a branch line by section 23 of Act March 3, 1871 (16 Stat. 573), that such grant should "in no way affect or impair the rights, present or prospective, of the Atlantic and Pacific Railroad Company, or any other railroad company," excluded from such grant all lands to which, at the time the Southern Pacific Company filed the map of the definite location of its branch line, the Texas Pacific Railroad Company had acquired a prospective right under the same act by the filing of the map of its general route, and which were thereupon, as required by the act, withdrawn from the market by an executory order.

2. SAME—CONSTRUCTION OF GRANTS—DEFINITE LOCATION OF ROAD.

A line of railroad is not "definitely fixed," within the meaning of an act granting lands on either side of such line to aid in its construction, so as to determine the exterior limits of the grant, and prevent the lands from being granted to or earned by another company, until it has been definitely located on the ground, and such location approved by the action of the company, so that it cannot thereafter be changed at its option, and a map of such location filed with the government in the usual and proper manner.

3. SAME—TEXAS PACIFIC LINE IN CALIFORNIA.

The line of road of the Texas Pacific Railroad Company was never "definitely fixed" in the state of California on the route surveyed between Yuma and San Diego by way of the San Gorgonio Pass, so as to give that company any prospective right to the lands adjacent to such line under the grant made by Act March 3, 1871 (16 Stat. 573), which would prevent such lands from passing to the Southern Pacific Company under the grant to that company made by the same act, where such lands were within the limits of its grant as fixed by the location and construction of its road.

4. SAME—VARIANCE FROM ROUTE DESIGNATED IN ACT

The act incorporating the Texas Pacific Railroad Company, and making it a grant of lands to aid in the construction of its road, which required it to construct the western section of its road from a point on the Colorado river at or near the southeastern boundary of California to San Diego, "pursuing in the location thereof, as near as may be, the thirty-second parallel of north latitude," did not authorize the construction of its road on the line surveyed between such points by way of the San Gorgonio Pass, near the thirty-fourth parallel; and the selection of such route, even if the line had been definitely fixed thereon, would not have given the company any prospective right to the lands adjacent, under the act.

Appeals from the Circuit Court of the United States for the Southern District of California.

Joseph H. Call, for the United States.

Wm. Singer, Jr. (Wm. F. Herrin, of counsel), for Southern Pac. R. Co.

Before GILBERT and MORROW, Circuit Judges, and HAWLEY, District Judge.

109 F.—58

HAWLEY, District Judge. The general history, character, and nature of these suits are fully stated in the opinion of the circuit court in U. S. v. Southern Pac. Co., 94 Fed. 427, to which reference is here made. It appears therefrom that three separate, independent suits were instituted by the United States against the Southern Pacific Railroad Company for the purpose of determining the title to certain odd-numbered sections of land within the 20 and 30 mile limits of the grant made by the United States to the Southern Pacific Railroad Company by act of congress of March 3, 1871, which lands are also within 20 miles of the general route of the Texas Pacific Railroad Company, as indicated by its map thereof filed in the office of the secretary of the interior, or within 30 miles of the alleged definite location of the Texas Pacific Railroad Company from Yuma, on the Colorado river, by way of San Gorgonio Pass, to San Diego, Cal.; to cancel such patents as had theretofore been issued by the government of the United States to the Southern Pacific Railroad Company under the grant of March 3, 1871; and to quiet the complainant's title to all of the lands referred to. Pending the preliminary stages of the proceedings in these cases, the court, upon the filing of a stipulation by the respective counsel, made an order consolidating the suits. After the consolidation, the government, on May 26, 1896, filed an amended and supplemental bill of complaint, on which issue was thereafter duly joined, and the suit tried. Prior to the submission of the cause in the circuit court, the government dismissed the suit in so far as it concerned all of the lands mentioned for which patents had been issued by it, except about 5,000 acres, which the Southern Pacific Railroad Company had contracted to sell to the Colorado River Irrigation Company, a party defendant herein. The suit as submitted to the circuit court involved those 5,000 acres, and all of the unpatented odd-numbered sections of land embraced within the primary and indemnity limits of the Southern Pacific Company's grant of March 3, 1871, that are also within 20 miles of the general route of the Texas Pacific Company, as indicated by its maps thereof filed in the general land office, or within 30 miles of the asserted definite location of the Texas Pacific Railroad from Yuma, by way of San Gorgonio Pass, to San Diego, Cal. The circuit court, upon the hearing of the case, held that the United States were entitled to a decree for the lands within the 20-mile limits of the map of general route filed in 1871 by the Texas Pacific Railroad Company, which were reserved by executive orders in October, 1871, which lands are unpatented. As to the remainder of the lands described in the bill, including a quarter section claimed by one Crawford as a homestead, the court adjudged that the government take nothing, and a decree to that effect was duly entered. From this decree the Southern Pacific Railroad Company and the other defendants appealed, and assigned as error that the court erred in deciding that the United States are the owners by title in fee simple absolute, or the owners in any wise of the lands, or any part thereof, described in the first subdivision of the decree. From that part of the decree against the United States as to the lands embraced by the bill, other than those

reserved in the act of 1871 for the Texas Pacific Railroad Company, the United States took a cross appeal, and made the following assignment of errors:

"(1) The court erred in refusing to adjudge that the United States was the owner by title absolute and in fee of the lands described in the bill, situated outside of the twenty-mile limits of the line of route of the Texas Pacific Railway Company, shown by the map filed by said company on October 15, 1871. (2) It being the intention of congress, by the act of March 3, 1871, to exclude and except from the grant to the Southern Pacific Railroad Company, made by the act of March 3, 1871, all of the lands to which the Texas Pacific Railway Company had a present or prospective right, to wit, the lands within forty miles of the line of route of said Texas Pacific Railway Company, as definitely fixed, the court erred in adjudging that the United States was not entitled to a decree for the lands within forty miles of the line of route surveyed and fixed upon for construction by said company from Fort Yuma, on the Colorado, via San Gorgonio Pass, to the Bay of San Diego, as more fully described in the annual report of said company to the secretary of the interior for the year ending June 30, 1874, and erred in refusing to annul all patents issued to said Southern Pacific Railroad Company for such lands. (3) It being the intention of congress to exclude and except from the Southern Pacific grant of March 3, 1871, all the lands designated by odd-numbered sections within the forty-mile limits of the line of route of the Texas Pacific Company between the Colorado river and the Pacific Ocean, the court erred in refusing to grant to the United States a decree quieting its title and annulling patents issued to all or any of the lands within forty miles of the line of route of the Texas Pacific Railway Company between the Colorado river and the Pacific Ocean, as designated and fixed in section 1 of said act of March 3, 1871, to wit, from 'a point on the Rio Colorado at or near the southeastern boundary of the state of California; thence by the most direct and eligible route to San Diego, California, to ship's channel in the Bay of San Diego, in the state of California, pursuing in the location thereof, as near as may be, the thirty-second parallel of north latitude.' (4) The court erred in adjudging defendant Colorado River Irrigation Company to be a bona fide purchaser from the Southern Pacific Railway Company for any of the lands described in the bill for which this suit is brought. (5) As to the northwest quarter of section 17, township 7 south, range 3 east, as to which tract the court dismissed the bill, it appearing that said land is outside of the granted limits of the grant to the Southern Pacific Railroad Company, and that said tract was settled upon as a homestead on August 1, 1887, by one Joseph Crawford, he being duly qualified, and he having a valid, subsisting, and unexpired settlement right upon said land under the homestead law, upon October 3, 1887, when said Southern Pacific Railroad Company selected said land as indemnity, the court erred in refusing to grant the United States a decree annulling the patent and certification of said land to said company."

Both parties claim grants of land under the provisions of the act entitled:

"An act to incorporate the Texas Pacific Railroad Company, and to aid in the construction of its road, and for other purposes." 16 Stat. 573.

Section 1 of this act provides for the incorporation of the Texas Pacific Railroad Company, and authorized it to lay out—

"Locate, construct, furnish, maintain and enjoy a continuous railroad and telegraph line, with the appurtenances, from a point at or near Marshall, county of Harrison, state of Texas; thence by the most direct and eligible route, to be determined by said company, near the thirty-second parallel of north latitude, to a point at or near El Paso; thence by the most direct and eligible route, to be selected by said company, through New Mexico and Arizona, to a point on the Rio Colorado, at or near the southeastern boundary

of the state of California; thence by the most direct and eligible route to San Diego, California, to ship's channel, in the Bay of San Diego, in the state of California, pursuing in the location thereof, as near as may be, the thirty-second parallel of north latitude, and is hereby vested with all the powers, privileges, and immunities necessary to carry into effect the purposes of this act."

### Section 9 provides as follows:

"That for the purpose of aiding in the construction of the railroad and telegraph line herein provided for, there is hereby granted to the said Texas Pacific Railroad Company, its successors and assigns, every alternate section of public land, not mineral, designated by odd numbers, to the amount of twenty alternate sections per mile, on each side of said railroad line, as such line may be adopted by said company, through the territories of the United States, and ten alternate sections of land per mile on each side of said railroad in California, where the same shall not have been sold, reserved, or otherwise disposed of by the United States, and to which a pre-emption or homestead claim may not have attached at the time the line of said road is definitely fixed. In case any of said lands shall have been sold, reserved, occupied, or pre-empted, or otherwise disposed of, other lands shall be selected in lieu thereof by said company, under the direction of the secretary of the interior, in alternate sections, and designated by odd numbers, not more than ten miles beyond the limits of said alternate sections first above named, and not including the reserved numbers."

### Section 12 provides as follows:

"That whenever the said company shall complete the first and each succeeding section of twenty consecutive miles of said railroad and put it in running order as a first-class road in all its appointments, it shall be the duty of the secretary of the interior to cause patents to be issued conveying to said company the number of sections of land opposite to and coterminous with said completed road to which it shall be entitled for each section so completed. Said company, within two years after the passage of this act, shall designate the general route of its said road, as near as may be, and shall file a map of the same in the department of the interior; and when the map is so filed, the secretary of the interior, immediately thereafter, shall cause the lands within forty miles on each side of said designated route within the territories, and twenty miles within the state of California, to be withdrawn from pre-emption, private entry, and sale."

### Section 13 of the act provides:

"That the president of the company shall annually, by the first day of July, make a report and file it with the secretary of the interior, which report shall be under oath, exhibiting the financial situation of the company, the amount of money received and expended, and the number of miles of road constructed each year; * * * a description of the lines of road surveyed and fixed upon for construction."

The grant to the Southern Pacific Railroad Company is made in section 23 of this act, which reads as follows:

"That, for the purpose of connecting the Texas Pacific Railroad with the city of San Francisco, the Southern Pacific Railroad Company of California is hereby authorized (subject to the laws of California) to construct a line of railroad from a point at or near Tehachapa Pass, by way of Los Angeles, to the Texas Pacific Railroad at or near the Colorado river, with the same rights, grants, and privileges, and subject to the same limitations, restrictions and conditions as were granted to said Southern Pacific Railroad Company of California, by the act of July twenty-seven, eighteen hundred and sixty-six: provided, however, that this section shall in no way affect or impair the rights, present or prospective, of the Atlantic and Pacific Railroad Company or any other railroad company."

The record shows that the Texas Pacific Railroad Company on August 15, 1871, filed a map of its general route from a point in Texas to the Bay of San Diego, showing the line of route, designated as the "direct line"; that the Southern Pacific Railroad Company on April 3, 1871, filed a map of its general route from Tehachapa Pass via Los Angeles to the Colorado river at a point near Yuma.

1. Had the Texas Pacific Railroad Company, or any other railroad company, acquired any present or prospective right to any of the lands embraced in this suit at the time the grant was made by the government to the Southern Pacific Railroad Company, March 3, 1871? The answer to this question will dispose of the appeal taken herein by the Southern Pacific Company, and will be found in the opinion of the court in U. S. v. Colton Marble & Lime Co., 146 U. S. 615, 13 Sup. Ct. 163, 36 L. Ed. 1104. It is true that in that case the court confined itself to the conflicting claims of the Southern Pacific and the Atlantic & Pacific Company; but, by reference to the provisos in the grant to the Southern Pacific, it will be seen that it also includes "present or prospective" rights of "any other railroad company"; and it therefore necessarily follows that the views expressed by the supreme court in that case apply with equal force to the conflicting claims, if any, between the Southern Pacific and the Texas Pacific, because whatever rights the Texas Pacific Company ever acquired to any of the lands in question continued to exist until the act of forfeiture passed by congress February 28, 1885, and as long before that time the Southern Pacific Company had built the road it was authorized to construct, and filed in the general land office maps showing its definite location, it necessarily follows that if at the latter date the lands in suit, or any of them, were for any reason reserved, or were lands to which the Texas Pacific Company had acquired a present or prospective right, such lands did not pass to the Southern Pacific Company under its grant. For as to such lands the Texas Pacific Company certainly had a "prospective," if it did not have a "present right." Inasmuch as the grants to the Southern Pacific and Texas Pacific Railroad Companies were given by the same act, and of the same date, the ordinary and usual rule would be to give each of said companies one-half of such lands as were within both grants. But the case under consideration is taken out of the ordinary rule by the proviso annexed to the grant to the Southern Pacific Company. In U. S. v. Colton Marble & Lime Co., supra, the court, speaking of a similar proviso, said:

"What is the significance of this proviso? * * * It cannot be supposed that this proviso was meaningless, and that congress intended nothing by it. Carefully inserted, in a way to distinguish this grant from ordinary, later, and conflicting grants, it must be held that congress meant by it to impose limitations and restrictions different from those generally imposed in such cases; and it, in substance, declared that the Southern Pacific Company should not in any event take lands to which any other company had at the time a present or prospective right. * * * What were the prospective rights of the Atlantic & Pacific Company? Of course, it could not be known at the time of the passage of the later act exactly where the lines of the two companies would be located, and where the point of crossing would be. Neither could it then be known that there would be any deficiency in the granted

lands at the point of crossing, or that, if such deficiency existed. it would require all the indemnity lands to make good the loss. It might well be assumed that very likely the Atlantic & Pacific Company would be called upon to select from the indemnity lands a portion sufficient to make good the deficiency in the granted limits. That right of selection was a prospective right, and, if it was to be fully exercised, no adverse title could be created to any lands within the indemnity limits. Suppose, for instance, it should turn out that only half of the indemnity lands were necessary to make good the deficiency, and that one-half of such lands were well watered and valuable, while the remainder were arid and comparatively valueless; obviously the right of selection would be seriously impaired if it were limited to only the arid and valueless tracts. In fact, every withdrawal of lands from the aggregate of those from which selection could be made would more or less impair the value of the right of selection. The only way in which force can be given to this proviso is to hold that the indemnity lands of the Atlantic & Pacific were exempted from the grant to the Southern Pacific; for, if not exempted, the former company's prospective right of selection would be to that extent impaired."

This disposes of the appeal taken by the Southern Pacific Company, which only covers a small portion of the land in controversy. The decree of the circuit court in relation to these lands is correct, and will be affirmed.

2. We will now proceed to consider the questions raised in the appeal taken by the United States, which cover a much greater part of the lands involved herein, and relate to the lands that are embraced within the primary and indemnity limits of what appellants contend was the definite location of the route of the Texas Pacific Railroad Company, extending from Yuma, by way of San Gorgonio Pass, to San Diego. On the other hand, it is insisted by the Southern Pacific Company that the Texas Pacific Company never had the right to construct, build, or locate any railroad from Yuma to San Diego by way of San Gorgonio Pass, and that, as a matter of fact, it never did definitely locate any such road. Was the line of the Texas Pacific Railroad Company ever definitely located and fixed, or authorized to be built by said company under the acts of congress? Unless both of these propositions are affirmatively established by the evidence, it follows that the decree of the circuit court in favor of the Southern Pacific Company as to these lands must be affirmed. The questions involved are important, and demand a careful and searching review of the evidence, as well as of the general principles of law applicable thereto. In the consideration of these questions, it must be remembered that it is conceded by both parties that the Southern Pacific Company fully performed the conditions of the granting act. The record clearly shows that it fully completed its railroad along the proposed route, and earned the lands granted by the act. It is admitted that the lands involved herein are all within the limits of said grant, unless excepted therefrom by the Texas Pacific grant. It is also admitted that the Texas Pacific Company never constructed or built the road authorized by congress. The contention of the government is that the lands in question, which were granted to the Texas Pacific Railroad Company by the act of March 3, 1871 (16 Stat. 573), were restored to the government by the provisions of the act of February 28, 1885 (23 Stat. 337), forfeiting the grant for failure to construct

a railroad in aid of which the grant was made, and that no right or title attached to said lands under the land grant of the Southern Pacific Company. The contention of the appellee is that the Texas Pacific Company was not authorized to construct any railroad which could in any manner vest in it any right or interest in the lands in controversy, except a small quantity mentioned in the opinion of the lower court; and as a matter of fact, established by the evidence, it never did definitely locate and fix any line of railroad, or acquire any right whatever to any lands in California, and that its grant at no time affected the status of any lands in this state. By examining the first section of the act creating the Texas Pacific Railroad, it will be observed that it is specifically authorized to construct a continuous railroad from and to certain designated points. It is divided into three sections. The requirements as to each section of the line of road are, to some extent, distinct from the others. From Marshall to El Paso the requirement is that it shall be "by the most direct and eligible route, to be determined by said company, near the thirty-second parallel of north latitude." From El Paso to Yuma it is to be "by the most direct and eligible route to be selected by said company." From Yuma to San Diego it must be "by the most direct and eligible route, * * * pursuing in the location thereof, as near as may be, the thirty-second parallel of north latitude." With reference to the question whether the line of the Texas Pacific Railroad was ever definitely fixed from Ft. Yuma to San Diego through the San Gorgonio Pass, it appears that in the years 1872 and 1873 the Texas Pacific Company caused numerous surveys of the different lines between the Colorado river and San Diego to be made by its chief engineer, Gen. G. M. Dodge, and division engineers, J. A. Evans and Joseph U. Crawford. The general results of these various surveys are embodied in a report made by the chief engineer to the president of the Texas Pacific Railroad Company on March 12, 1873, for the purpose of imparting sufficient information to enable the board of directors of said corporation "to determine upon the general route from San Diego east." The lines examined by the engineers are briefly stated in the report as follows:

"The lines examined are as follows: The direct line from San Diego to Ft. Yuma, known as the 'Otay Valley Line,' 203 $^{11}/_{100}$ miles long. The San Gorgonio Pass lines, numbered 1 to 4, marked 'Main Line' and 'A, B, C, D' on maps. No. 1. Main line, 313 miles long. No. 2. The coast line, via Temecula creek to the main line; thence by main line to the pass; 308 $^{73}/_{100}$ miles. No. 3. The coast line to Temecula; thence the main line to Le Laguna; thence up the San Jacinto river and San Bernardino; 302 miles. No. 4. The coast line; thence Temecula creek; thence line D direct to San Gorgonio Pass; 270 miles."

This report is copied at greater length in the opinion of the circuit court, in which the prominent features of each line are fully set forth, and to which reference is here made. The report made by Gen. Dodge was submitted by the president of the company to the board of directors, and on April 4, 1873, the board adopted the following resolution:

"On motion it was resolved that the line by San Gorgonio Pass, known as 'No. 4,' be, and the same is hereby, adopted as the route from San Diego, with such modifications as, in the judgment of the president, may be to the best interests of the company."

We do not understand the government to claim that this resolution definitely fixed the line by San Gorgonio Pass. Of course, it could not do so. At most, it can only be considered as expressing a willingness on the part of the directors to adopt that line, provided the president of the company should, in his judgment, deem it to be to the best interests of the company so to do. It is apparent that no railroad could be definitely located by a resolution made subject to such modifications or provisos. But it is earnestly argued that the line of road was definitely fixed and located by the report of Gen. Dodge, as chief engineer, made in May, 1874, and it is claimed that this report gives an accurate description of the line. It reads as follows:

"Beginning at Ft. Yuma, from there the line runs in a northwesterly direction, passing to the north of the sand hill and across the Salt Lake district of the Colorado desert of California, over which our line for 45 miles is below sea level; the lowest point being 290 feet below tide water. In crossing this, the line passes on the north margin of the Salt Lake of the Colorado desert; leaving the mud volcanoes about five miles to the south, and the Dos Palmos stage station about the same distance to the north we reach the Cabazon valley, 113 miles from Ft. Yuma; thence on nearly the same course 50 miles, to the summit of San Gorgonio Pass, running 1¼ miles south of White Water stage station, and one mile south of Devontine's ranch, reaching the summit 2½ miles south of Edgar's ranch. This pass is 2,621 feet above tide water, and its small elevation must be considered remarkable, as it lies between the San Bernardino and San Jacinto mountains, the highest peaks of the range. Leaving San Gorgonio Pass, our course is southwest, passing down one of the tributaries of the San Jacinto which is known as the Potrero (or Pocket) of the San Jacinto, to the San Jacinto plains and Temecula plains. These plains lie between the main range and the Santa Ana range, and down the Temecula plains to the head of the Temecula cañon, and down the cañon where the Temecula breaks through the Santa Ana range, 10 miles to the open valley, striking the coast near the (13) San Coronado ranges, about 40 miles north of San Diego; then south and down the coast on the western slope of the Soledad Mountains, crossing the Soledad, San Luis Rey, San Dieguito, the ravine of La Jolla, skirting False Bay; then to the shore of San Diego Bay, and along the shore of the bay to the depot grounds of the Texas Pacific Railway below the Pacific Steamship Company's wharf. Distance from the Pima villages on the Gila river, 444.4 miles."

In this report Gen. Dodge says that:

"Since July, 1872, the surveys have been extended from the Red river, in Texas, to the Pacific Ocean, in the general direction of the thirty-second parallel of latitude, exploring a country 200 miles in width, developing its resources, bringing to light its hidden treasures, and fully demonstrating its capability for building and sustaining a railroad to the Pacific Ocean. The country has been systematically developed. Explorations have been pushed to success, and one after another of the engineering obstacles supposed to exist to the building of the Southern Pacific Railway have been met and overcome. The route of the road has been definitely fixed, and unquestionably is the best to be had across the continent in the zone which has been explored."

We are unable to agree with the learned counsel for the government that this report definitely locates the line of the road. The

language is too general and indefinite for any such purpose. The law certainly requires some further action on the part of the company to show that this route had been so definitely fixed as to put it beyond the power of the company to change it. No force or effect whatever can be given to the statement of the chief engineer that "the route of the road has been definitely fixed." The statute nowhere declares that the opinion of such an officer shall be sufficient to show that the railroad line has been "definitely fixed." "An engineer may make explorations in advance of a location, or he may remark the line or adjust the grades after the adoption of a location; but an engineer alone cannot locate a railroad, so as to give title to the company that employs him. He is not the company. The right of eminent domain does not reside in him." Williamsport & N. B. R. Co. v. Philadelphia & E. R. Co., 141 Pa. 407, 417, 21 Atl. 645, 647.

Some stress is also made upon the fact that in the annual report of the Texas Pacific Railroad to the United States for the fiscal year ending June 30, 1876, it is said:

"A full description of the line of road surveyed and fixed upon for construction was given in the report made to the department of the interior July 1, 1874."

This report, like several others contained in the record, is required to be made by section 13 of the act of 1871, the provisions of which, it will be observed, are principally concerning matters of a financial nature. There is nothing contained therein which could, by any consistent course of reasoning, be claimed to excuse the railroad company from making a definite location of the road. If the road had not been definitely located, it is difficult to see how any statement in such report could so "fix" it. The land grant must be controlled by the facts, not by the financial reports filed by the company under and in compliance with the provisions of section 13. It could not, we apprehend, be seriously argued that the mere filing of such reports would earn, or the failure to file them forfeit, the land grants contained in the other section of the act.

There are certain maps attached to some of the reports made to the secretary of the interior, of an uncertain and indefinite nature, which are, in our opinion, wholly insufficient to fix the definite location of the railroad on any of the surveyed lines, or entitle them to be designated as maps of the general route. But they are nevertheless claimed by counsel for appellant to be, of themselves, sufficient to protect the rights of the Texas Pacific. None of the maps are sufficient of themselves to withdraw the lands, so as to prevent the Southern Pacific Company from earning the lands granted to it at any time prior to a date of the filing of a map of definite location by the Texas Pacific Company. A map "of a general route" is not of itself sufficient for that purpose. In U. S. v. Oregon & C. R. Co., 176 U. S. 28, 43, 46, 20 Sup. Ct. 261, 44 L. Ed. 358, the court, in discussing matters applicable as well to this as to that case, among other things said:

"If, therefore, the Perham map of 1865 were conceded, for the purposes of the present discussion, to have been sufficient as a map of 'general route,' —and nothing more can possibly be claimed for it,—these lands could not

be regarded as having been brought by that map (even if it had been accepted) within the grant to the Northern Pacific Railroad Company, and thereby have become so segregated from the public domain as to preclude the possibility of their being earned by other railroad companies under statutes enacted by congress after the filing of that map, and before any definite location by the company of its line."

The court, after calling attention to some general expressions used by Mr. Justice Field in Buttz v. Railroad Co., 119 U. S. 55, 71, 72, 7 Sup. Ct. 100, 30 L. Ed. 330, said:

"This language was too broad, if it is construed to express the thought that public lands, when within the exterior lines of a 'general route,' are 'appropriated' from the time the map of such route is filed, so as to prevent them from being granted by congress to, and from being earned by, another railroad corporation prior to the filing of a map of definite location by the company designating such general route. In Railroad Co. v. Sanders, 166 U. S. 620, 634, 635, 636, 17 Sup. Ct. 671, 41 L. Ed. 1139, this court, referring to the act of July 2, 1864, said: 'The company acquired, by fixing its general route, only an inchoate right to the odd-numbered sections granted by congress, and no right attached to any specific section until the road was definitely located, and the map thereof filed and accepted. Until such definite location, it was competent for congress to dispose of the public lands on the general route of the road as it saw proper.' * * * We take it, then, to be indisputable that even if the Perham map of 1865 were regarded as a sufficient map of the 'general route' of the Northern Pacific Railroad, and not, to use the language of Judge Ross in this case, a mere sketch or diagram unauthenticated by any engineeer or officer charged with the duty of designating such a route, nothing stood in the way of congress granting to another railroad company any lands within the exterior lines of that route, by a statute passed after such map was filed in the land department, and before a definite location of the Northern Pacific Railroad."

There are divers other facts and circumstances contained in the lengthy record in this case which are referred to in the brief filed by the special United States attorney, which are, in connection with the reports of Gen. Dodge, claimed to be sufficient to establish the proposition that the line of said road had been "definitely fixed," within the meaning of those words as used in section 9 of the act of March 3, 1871. We have carefully examined the record upon all of the points relied upon by the learned counsel, and have arrived at the conclusion that there is no sufficient evidence to support this contention. The subsequent reports and testimony of the various officers, engineers, and employés of the railroad company, in our opinion, clearly show that the line of the railroad was not definitely located in 1874, or at any time prior thereto. True it is that it seems to have been "definitely fixed" in the mind of the chief engineer, but it had not been "definitely fixed" on the face of the earth, nor in any other manner sufficient to comply with the provisions of the statute. No line of a railroad can be considered as definitely fixed unless it has, by some action which is binding upon the company and the government, ceased to be the subject of change at the mere volition of the railroad company. In so far as the object and purposes of the grant of lands mentioned in the statute are concerned, it must affirmatively appear that the line of the road has been so definitely located and fixed that it cannot thereafter be the subject of any change in the route so as to affect the rights of any other parties. It is true that the

line in question was surveyed, in connection with several other routes, but the definite location of the road on one of the surveyed lines was an act to be performed by the railroad company. It was to select for itself the definite line of location upon which its road was to be built, and, under the general principles of the law upon this subject, it is required to report its action to the government by filing a map of its definite location in the usual and proper manner. Van Wyck v. Knevals, 106 U. S. 360, 366, 1 Sup. Ct. 336, 27 L. Ed. 201; Land Co. v. Griffey, 143 U. S. 32, 38, 12 Sup. Ct. 362, 36 L. Ed. 64, and authorities there cited; Railroad Co. v. Sage, 17 C. C. A. 558, 71 Fed. 40, 48–50. In Tarpey v. Madsen, 178 U. S. 215, 228, 20 Sup. Ct. 849, 44 L. Ed. 1042, the court, in discussing the rights of the railroad company and individual entrymen, announced certain general principles that are directly applicable here. The court said:

"Recapitulating, we are of opinion that a proper interpretation of the acts of congress making railroad grants like the one in question requires that the relative rights of the company and an individual entryman must be determined, not by the act of the company in itself fixing definitely the line of its road, or by the mere occupancy of the individual, but by record evidence. —on the one part the filing of the map in the office of the secretary of the interior, and, on the other, the declaration or entry in the local land office. In this way matters resting on oral testimony are eliminated; a certainty and definiteness is given to the rights of each; the grant becomes fixed and definite."

But even if it could be held, as contended for by appellant's counsel, that it was not required to file such map because not specifically provided for by the language of the statute, then it certainly must make other sufficient proofs of the time and manner in which the line of location was "definitely fixed," in order to bind all parties claiming any rights to said lands. The evidence in the record, taken in its entirety, upon this point, in our opinion, clearly shows that the line of the Texas Pacific Railroad from Ft. Worth, by way of San Gorgonio Pass, to San Diego, was never, in any manner known to the law, definitely fixed.

The testimony of J. U. Crawford is to the effect that in 1877 he met Gen. Dodge, John C. Brown, then vice president of the Texas Pacific Company, and Mr. Frank Bond, who was also an official of said company, in Washington, D. C.; that at that time the Texas Pacific Company was seeking aid from the government "to construct the railroad upon the thirty-second parallel"; that in the year 1877 he got a telegram from Mr. Bond to go to San Diego and try to reduce the quantities upon the direct line surveyed by Reno; that the Southern Pacific Company occupied the San Gorgonio Pass in 1877; that he was representing San Diego at that time; that the people of that city "thought they would be cut off, and we were representing them. You notice the report of the committee states that San Diego had more merits in its argument than anywhere else. You will find we made a strong fight to connect San Diego by the direct line. It was a fight for aid and a fight for life for San Diego." It further appears from the record that

in 1878 Mr. Brown, the vice president, in addressing the committee on Texas Pacific Railroad, among other things, said:

"I wish to state, in reply to Mr. Huntington, when he says that Col. Scott, two years ago, declared that the road could not be constructed over the direct route from Yuma to San Diego, that we have since that time had skillful and intelligent engineers to go over that country, and they have explored cañons and passes not before examined by our engineers, and revised the former line; and they report that the direct line is entirely practicable, and that it can be built at much less cost than similar work done on the Southern Pacific or Central Pacific roads. * * * There are thirty miles of this route which will be very expensive. Some of it may cost $250,000 to $300,000 per mile, but the average will not exceed $36,000 per mile."

Does not this testimony clearly show that no definite location of the road had been made? Why seek aid, or make new surveys of the direct line on the thirty-second parallel, if three years prior to that time the road had been definitely fixed on the other route? It follows from the conclusions we have reached upon this point that the lands granted to the Southern Pacific Company by the act of 1871 have never been excluded therefrom by reason of any definite location of the Texas Pacific Railroad.

3. The other ground relied upon by appellees is equally as well established, and leads to the same result. Was the Texas Pacific Railroad Company ever authorized to build the line of road we have been discussing? We are of opinion it was not. It is admitted that the Otay line, referred to in the report of the chief engineer on March 12, 1873, is a direct line from Yuma to San Diego. It substantially conforms to the line designated by the company on the map of the general route which was filed with the secretary of the interior, to which we have heretofore referred. It is also a line which substantially conforms with the general description of the route as mentioned in section 1 of the act of March 3, 1871, upon which the Texas Pacific Company was authorized to construct and build its road. It follows the description given in the act, "pursuing in the location thereof, as near as may be, the thirty-second parallel of north latitude," while the line in controversy, starting from Yuma, runs about 163 miles in a northwesterly direction to the summit of San Gorgonio Pass, near the thirty-fourth parallel of north latitude; thence runs southwesterly to the Pacific Coast; thence south 40 miles along the coast to San Diego. Instead of pursuing, "as near as may be, the thirty-second parallel of north latitude," the line for a considerable distance pursues, "as near as may be," the thirty-fourth parallel of north latitude. Moreover, the act, in section 23, granting lands to the Southern Pacific Railroad Company "for the purpose of connecting the Texas Pacific Railroad with the city of San Francisco," authorized the Southern Pacific Company to construct a line of railroad "from a point at or near Tehachapa Pass by way of Los Angeles to the Texas Pacific Railroad, at or near the Colorado river." It was never intended by congress, in the passage of the act of March 3, 1871, that the respective railroads should run parallel with each other. They were to meet at a point near the Colorado river, yet

the line of the Texas Pacific from Yuma to San Gorgonio Pass practically parallels the Southern Pacific road. We are of opinion that the Texas Pacific Company had no authority under the act of March 3, 1871, or supplemental act of May 2, 1872 (17 Stat. 59), to build any road on the line in question. The act of 1871 in its description of the general route is similar to the act of July 2, 1864 (13 Stat. 365), granting lands to the Northern Pacific Railroad Company. In U. S. v. Northern Pac. R. Co., 152 U. S. 284, 292, 14 Sup. Ct. 598, 38 L. Ed. 443, the court, in considering the question whether that act contained a grant of lands in aid of the construction by the Northern Pacific Railroad Company of a railroad from Portland to Puget Sound, said:

"Although that act allowed the company to adopt the most eligible route, within the territory of the United States, north of the forty-fifth degree of latitude, it is clear that congress contemplated the construction of a main trunk line between Lake Superior and Puget Sound, which would not touch any point 'at or near Portland,' and the western end of which would be east and northeast of a direct line between Portland and Puget Sound, and, in addition, a branch line leaving the main trunk line at some suitable place, not more than three hundred miles from its western terminus, and extending 'via the valley of the Columbia river to a point at or near Portland.' If the main line, as originally indicated by the act of 1864, had been established on the route between Portland and Puget Sound, the branch line could not have left the main line at some point not more than three hundred miles from its western terminus, and extended via the valley of Columbia river to a point at or near Portland. The authority given to the company to adopt the most eligible route did not authorize it, by a map of general route, to cover an unlimited extent of country north of the forty-fifth degree of latitude. On the contrary, as is said in St. Paul & P. R. Co. v. Northern Pac. R. Co., 139 U. S. 1, 13, 11 Sup. Ct. 389, 35 L. Ed. 77: 'When the termini of a railroad are mentioned, for whose construction a grant is made, the extent of which is dependent upon the distance between those points, the road should be constructed upon the most direct and practicable line. No unnecessary deviation from such line would be deemed within the contemplation of the grantor, and would be rejected as not in accordance with the grant.' It may be that the indefiniteness of the map of general route presented by the Northern Pacific Railroad Company in 1865 constituted the reason why that map was not accepted by the interior department. Besides, it is not found as a fact in this case that the most eligible railroad route for the main line, between Lake Superior and Puget Sound, looking at the purpose of congress in making the grant of 1864, was down the Columbia river, and via some point at or near Portland. It is clear that the purpose of congress, by the act of 1864, was not to connect Portland with Puget Sound by a road established upon the most direct or eligible route between those places, but, so far as Portland and its vicinity were concerned, to connect them with the east by a branch road, through the valley of the Columbia river, that would strike the main trunk line connecting Puget Sound and Lake Superior. There was no purpose by that act to make a grant of lands for a road to be located and constructed from a point 'at or near Portland' to Puget Sound."

4. The other points raised herein have passed beyond the pale of discussion. The lands patented to the Southern Pacific Company, and by it contracted to be sold and conveyed to the defendant Colorado River Irrigation Company, are fully protected by the confirmatory act of March 2, 1896 (29 Stat. 42), which supplements that of March 3, 1887 (24 Stat. 556), as was held in U. S. v. Southern Pac. R. Co. (C. C.) 86 Fed. 962; Id., 88 Fed. 832; Id., 38 C. C. A. 619, 98 Fed. 27; Id., 38 C. C. A. 637, 98 Fed. 45.

5. That the defendants, trustees of the Southern Pacific Company, have no greater rights in respect to the lands in controversy than has the railroad company, is clearly shown by the decision of the circuit court in U. S. v. Southern Pac. R. Co., 86 Fed. 962, and authorities above cited.

6. That the land claimed by the defendant Crawford was subject to settlement by him in 1887 is settled by the principles announced in Hewitt v. Schultz (recently decided by the supreme court) 21 Sup. Ct. 309, 45 L. Ed. ——.

The decree of the circuit court is, upon all points, affirmed, except as to the N. W. ¼ of section 17, in township 7 S., range 3 E., San Bernardino meridian, and as to this quarter section of land the decree of the circuit court is hereby reversed, with direction to the circuit court to enter a decree in favor of the United States vacating the patent for said quarter section issued by the United States to the Southern Pacific Railroad Company.