[L. A. No. 1292.   Department Two.—August 2, 1904.]

## FR. OTTO MULLER, Appellant, v. TRUMAN C. PALMER et al., Respondents.

VENDOR AND PURCHASER — CONTRACT OF SALE — MISREPRESENTATION — DEFECTIVE AND LITIGATED TITLE—RESCISSION—RECOVERY OF PURCHASE MONEY.—Vendors are presumed to know the condition of their own title, and where they represented at the time of a contract of sale that they had a good marketable title, which representation was untrue in fact, the title being then defective and involved in litigation, the purchaser had the right to rely upon the representation in making payments, and upon discovering the defective and litigated character of the title had the right to rescind the contract of sale and recover back the purchase money paid.

ID.—RIGHTS OF PURCHASER.—The purchaser, having contracted for a present marketable title, was not bound to take a title perfected after suit brought, and more than four years after the date of the contract; nor was he bound to take steps himself and incur expense for the purpose of correcting the title, or obtaining a title which the vendor did not possess.

ID.—ACTUAL FRAUD—FALSE STATEMENT—BELIEF OF TRUTH IMMATERIAL.—Actual fraud is committed where one, with intent to induce another to enter into a contract, makes a positive assertion in a manner not warranted by the information of such person, of that which is not true, even though he believes it to be true. A party will always be held to make good his statement in the form in which he makes it.

ID.—LANDS ERRONEOUSLY PATENTED—TITLE IN GOVERNMENT—PROTECTION OF BONA FIDE PURCHASERS.—Where the defendant's title primarily depended upon the title of a railroad company to lands erroneously patented, the title to which remained in the United States as the result of litigation, but it appeared that *bona fide* purchasers from the railroad company were to be protected under regulations of the secretary of the interior, involving expense to obtain a patent, the purchaser was not bound to incur such expense, nor to prove that his grantors were *bona fide* purchasers under such regulations.

ID.—DEFECTIVE TITLE NOT WAIVED—UNAUTHORIZED RECORD OF DEED.—Where a deed tendered by the vendors was sent by the purchaser to

CXLIV. Cal.—20

a title-insurance company in answer to a request for a correct de-
scription of the land, and the purchaser subsequently requested the
company to have the title examined and draw upon him for the
balance of the purchase money "as soon as the title should be exam-
ined and found to be clear and marketable," the purchaser did not
thereby authorize the record of the deed .by such company, and did
not by such record waive a defective and unmarketable title which
he never intended to accept or take.

APPEAL from a judgment of the Superior Court of Los
Angeles County. Waldo M. York, Judge.

The facts are stated in the opinion.

Henry C. Dillon, and George A. Corbin, for Appellant.

D. P. Hatch, and W. C. Petchner, for Respondents.

COOPER, C.—Action to recover three hundred dollars, with
interest, paid to defendants on a contract for the sale of cer-
tain real estate, described in the complaint.

Defendants had judgment, from which plaintiff has .ap-
pealed.

The case was submitted upon an agreed statement of facts,
which shows that in July, 1896, after a personal inspection of
the property, the plaintiff entered into a written contract with
the defendants, by which plaintiff agreed to purchase, and the
defendants to sell to him, the lands described in the complaint
for the sum of $2,025, of which sum three hundred dollars was
paid down and the balance to be paid January 1, 1897. De-
fendants represented to plaintiff that they were the owners of
an absolute and indefeasible estate in fee simple in the lands
and that they had a good, perfect, and marketable title, and
agreed to execute to plaintiff a bargain-and-sale deed with a
certificate guaranteeing the title.

After making the three-hundred-dollar payment, the plain-
tiff wrote to the Title Insurance and Trust Company of Los
Angeles asking what the charges would be for a policy insur-
ing the title to the said lands. The insurance company replied
stating that its charges would be twenty dollars, and asking
plaintiff for a correct description of the lands. Plaintiff an-
swered, sending the company a deed, which had been for-
warded by defendants to a mutual friend in Philadelphia
(that being the place of residence of plaintiff) with instruc-

tions to permit the plaintiff and his attorney to examine it, and the deed had been by said mutual friend delivered to plaintiff for the purpose of allowing the plaintiff to examine it. In the letter sending the deed plaintiff said to the company: "Inclosed please find deed, and proceed with the examination at once." This deed was, without authority, placed of record by the company, in the county where the land is situated. On November 12th plaintiff wrote to defendants offering to pay the balance of $1,725, if given a discount of seven per cent for the time anticipated, and in said letter informed defendants that he had forwarded the deed to the said company, and had instructed it to draw upon him for the said balance as soon as the examination of the title should be completed. This offer was accepted by defendants. Plaintiff thereupon notified said company, and sent his check for $1,725, asking the company to settle with defendants as soon as the title had been examined and found good. The company afterwards made and forwarded to plaintiff a policy of title insurance covering the property. and in the policy the following language was used: "The title to said property is vested in the said Fr. Otto Muller, provided the action of the United States of America *v.* Southern Pacific R. R. Co., now pending on appeal to the supreme court of the United States, is decided in favor of said railroad. . . . This company does not insure . . . against any of the following: . . . The right of the United States of America, by reason of a decision of the United States circuit court at Los Angeles, in case No. 184 of said court, which was a suit brought by the United States of America *v.* The Southern Pacific R. R. Co. et al., on May 17th, 1890, under the act of forfeiture of July 6th, 1886, to cancel the United States patent issued to said railroad company March 29th, 1876, for this and other lands lying within and forming part of the overlapping grants of the Atlantic and Pacific Railroad Co., and the Southern Pacific R. R. Company. Said decision as rendered July 19th, 1894, was adverse to said railroad company, and canceled said patent and others. An appeal was taken to the United States court of appeals for the ninth district where the judgment of the lower court was duly affirmed. (*Southern Pacific Co.* v. *United States,* 109 Fed. 913.) Said case is now pending on appeal to the United States supreme court."

The quoted clause in the policy was the first notice that plaintiff had concerning the title being defective and in litigation, and he immediately telegraphed to the company not to settle with defendants, but to return his check. He then notified defendants that he would not accept said deed, offered in writing to reconvey the land to defendants, tendered them a deed to it, and demanded a return of the three hundred dollars. This tender and demand were refused by defendants. After receiving the policy, the plaintiff paid the said company $22.15 for the policy and charges thereon, which, upon demand of plaintiff, was repaid to him by defendants. Shortly after the above occurrences, acting upon the advice of plaintiff's attorney and others, at a conference participated in by both plaintiff and defendants, the defendants had the company write another policy covering the property and insuring the title against said suit No. 184, mentioned in the first policy. One Brown, who was the personal friend and adviser of plaintiff and general manager of a real estate title insurance and trust company of Philadelphia, wrote to the company in Los Angeles and suggested on behalf of plaintiff the phraseology in the second policy, which was accordingly inserted therein, and which is as follows:—

"The rights of the United States of America if the decision in case 184 United States district court rendered against the Southern Pacific Railroad Company et al. is affirmed by the supreme court of the United States. Loss by reason of such adverse decision is hereby insured against." Plaintiff does not appear to have agreed to waive any defect in the title, or to accept the second policy.

The second policy was issued February 27, 1897, and was immediately forwarded to plaintiff at Philadelphia, who thereupon refused to accept it.

The following is stipulated as to the federal statutes, rules, and decisions affecting the title to the land in controversy: "March 29th, 1876, the United States issued a patent to said lands to the Southern Pacific Railroad Company. Said patent was recorded at the instance of the patentee in the office of the recorder of Los Angeles County, California, on the 13th day of December, 1880, at page 563 of book 2 of patents. The defendants deraigned their title from Ismert and Mack, who bought of said railroad company, June 21st, 1886, without

notice of any claim of the United States, the purchase price therefor having been wholly paid to said railroad company, and defendants were holding and in possession of said lands at the time of their contract with the plaintiff.

"By act of Congress of July 6th, 1886, said lands were declared forfeited and restored to the public domain. Suit was begun by the United States against the Southern Pacific Railroad Company, to quiet title, and on July 19th, 1894, it was decreed by the United States circuit court that said lands had been erroneously patented to said railroad company, and the legal title thereto was vested in the United States. An appeal was taken to the circuit court of appeals, and afterwards to the United States supreme court, which affirmed the decree of the lower court October 18th, 1897. (24 Stats. 557, U. S. Comp. Stats. 1901, p. 1596.) However, by the 4th section of the act of Congress of March 3rd, 1887, it was provided: 'That as to all lands . . . which have been so erroneously certified or patented as aforesaid, and which have been sold by the grantee company to citizens of the United States, or to persons who have declared their intention to become such citizens, the person or persons so purchasing in good faith, his heirs or assigns, shall be entitled to the land so purchased upon making proof of the fact of such purchase at the proper land office, within such time and under such rules as may be prescribed by the secretary of the interior, after the grants respectively shall have been adjusted; and the patents of the United States shall issue therefor, and shall relate back to the date of the original certification or patenting: Provided further that where such purchasers, their heirs or assigns, have paid only a portion of the purchase price to the company, which is less than the government price of similar lands, they shall be required, after delivery of patent for their lands, to pay to the government a sum equal to the difference between the portion of the purchase price so paid and the government price, and in such case the amount demanded from the company shall be the amount paid to it by such purchaser.'

"In conformity with said act the secretary of the interior, on February 13th, 1889, made the following rule for the guidance of registers and receivers, viz.: 'An applicant for land under this section (said No. 4), will be required to publish notice of intention to make proof as in pre-emption and homestead cases, and the proof must show:

" '1. That he has declared his intention to become a citizen of the United States.

" '2. That he is a *bona fide* purchaser from the company or of some person claiming title under it, and the character of the instrument conveying the land to him.

" '3. The amount of purchase money paid to the company.

" '4. What part, if any, of the purchase money paid to the company has been refunded to him or any person acting as his agent.

" '5. Whether he has instituted proceedings against the company for the recovery of any portion of the purchase money; if so, for what portion.

" '6. The value and character of the improvements, if any, made or acquired by him upon the land.

" '7. Whether there is any person of the first class under the third section entitled to the right of entry under the pre-emption or homestead laws.'

"Upon the submission of satisfactory proof as prescribed above, the register will issue certificate in duplicate, numbered in the regular cash series, with annotations thereon showing that the entry is allowed without payment under the fourth section of the act of March 3, 1887. (24 Stats. 557, U. S. Comp. Stats. 1901, p. 1596.)

"On the 19th day of January, 1900, the defendant, Truman G. Palmer, upon application and presentation of proofs as required by law, received from the receiver of the land office of the United States, at Los Angeles, California, a certificate covering said lands, and entitling said Palmer to a patent therefor under the provisions of said act of Congress of March 3rd, 1887; and the said defendant Palmer has since received from the United States government, a patent for said property."

The above is a statement of all the facts in the stipulation material to this controversy, and upon which the case must be decided.

The action was commenced in October, 1899, and judgment entered in March, 1902. We are of opinion that the plaintiff was entitled to judgment upon the stipulation. Defendants represented to plaintiff at the time of the agreement to purchase that they had a good marketable title. They were supposed to know the condition of their own title. The plaintiff

relied, and had a right to rely, upon the statement made to him
by defendants.  He was making a contract for the present pur-
chase of the lands, and not for the purchase of lands the title
of which could not be cleared till years should elapse.  As soon
as plaintiff found the true condition of the title, he offered to
reconvey, and demanded the return of the three hundred dol-
lars.  He rescinded promptly and offered to reconvey to the
defendants.  Defendants did not cure the defect in the title nor
offer to cure the same until long after the action was com-
menced.  It was not contemplated by plaintiff when he made
the contract in the early part of 1896 that he would bind him-
self to take a title that was not perfected until January, 1900.
It was not to be expected that plaintiff would take any other
than a good marketable title, which defendants had agreed to
give him, nor was he required to take steps himself and incur
expense for the purpose of correcting the title.  Any other rule
would work a great injustice to a party making a contract to
purchase real estate.  The party agreeing to sell, knowing he
had no title, could keep the part of the purchase money paid,
buy up outstanding titles or take other steps to get good title,
in case he found it to his advantage to do so, while the party
agreeing to purchase is all the time bound by the contract, and
when the title is perfected, the property may have greatly
depreciated in value, or the purposes for which he desired it
may have been wholly abandoned.  The risk of loss, in such
case, would be entirely thrown upon the purchaser.  The only
risk of the seller would be refunding the money, in case he
could not cure the title, or found it to be to his advantage not
to do so.  The rule that in cases free from fraud, where the
seller is innocent, it will be sufficient if the title is cured and a
good title tendered within a reasonable time, or when the deed
is to be made by the terms of the contract, has no application
to the facts in this case.

Defendants represented to plaintiff that they had a clear,
perfect, and marketable title before the contract was made and
the three hundred dollars paid.  They are supposed to have
known the condition of their own title.  Plaintiff did not know
it and had a right to rely upon the representation made to
him by defendants.  They procured his money by the repre-
sentations.  The representations were not true, and they must
refund it.  They will not be allowed to get the money of plain-

tiff by a false statement, and to keep it because long after-
wards they made the statement true. Plaintiff has not been
guilty of laches, but, on the contrary, as soon as he found the
condition of the title, he offered to reconvey and demanded his
three hundred dollars. He would thus have left the defend-
ants in the same condition they were before the contract, and
would have received back his money, which was obtained by
misrepresentation.

Actual fraud is committed where one, with intent to induce
another to enter into a contract, makes a positive assertion in
a manner not warranted by the information of such person of
that which is not true even though he believes it to be true.
(Civ. Code, sec. 1572.) One who gains a thing by fraud is,
unless he has some other and better right thereto, an involun-
tary trustee of the thing gained, for the benefit of a person
who would otherwise have had it. (Civ. Code, sec. 2224.)

It was held in *Alvarez* v. *Brannan*, 7 Cal. 504,[1] that where a
vendor, supposing himself to be the owner of a lot, represented
that he was such owner, and sold the lot to the vendee for six
thousand dollars, that the vendee upon discovering that the lot
had been previously sold to another party might rescind, and
recover the money paid. It is said in the opinion: "But it is
equally true that, whether a party thus misrepresenting a
material fact knew it to be false or made the assertion with-
out knowing whether it were true or false is wholly immaterial.
If a party asserts that as true which he does not know to be
true, it is a false representation. If he intends simply to state
his belief upon information, then he should state it in that pre-
cise form, so as to apprise the other party of the true grounds
upon which his statement is made. A party will always be
held to make good his statement in the form in which he makes
it. If he states a thing as true in general terms without quali-
fication, then he is presumed to do so upon his own knowledge,
or at his own peril, and must make good his assertion." And
the same rule is laid down by all the authorities. (1 Story on
Equity Jurisprudence, secs. 193, 193a, and note; 2 Pomeroy's
Equity Jurisprudence, sec. 887.)

It is said by Pomeroy in the section cited: "It is settled in
equity by an overwhelming array of authority, that where a
person makes a statement of fact which is actually untrue, and

[1] 68 Am. Dec. 274.

he has at the time no knowledge whatever of the matter, he is chargeable with fraud, and his claim to have believed in the truth of his statement cannot be regarded as at all material. The definite assertion of something which is untrue concerning which the party has no knowledge at all is tantamount in its effects to the assertion of something which the party knows to be untrue.''

The respondent contends that the grantors of the defendants were innocent purchasers, and that the title was not taken from them, nor divested by reason of the act of Congress and the decision of the supreme court of the United States. We do not think that the plaintiff was compelled to rely upon making proof as to the kind of purchasers some of the grantors of plaintiff were in order to clear his title or to establish it. The courts had declared that the lands had been erroneously patented, and that the legal title was still in the United States. It was declared that purchasers in good faith might by complying with certain rules and regulations, and making proof in compliance with such rules as the secretary of the interior might prescribe, secure their title and get patents. The secretary of the interior prescribed rules by which *bona fide* purchasers must publish notices of intention to make proof as in pre-emption and homestead cases and make proof showing the seven things contained in the stipulation. If it be conceded that plaintiff could have made the proper proof and complied with the rules as laid down by the secretary of the interior, yet he was not bound to do so. It would have involved time and expense, and plaintiff did not agree to assume any such burdens. It might, with as much reason, be claimed in any case where the title is defective that, if it is possible for him to do so, the vendee must cure it. But the vendee is entitled to a marketable title, and one free from reasonable doubt or pending litigation. (*Turner* v. *McDonald*, 76 Cal. 179;[1] *Sheehy* v. *Miles*, 93 Cal. 292; *Peckham* v. *Stewart*, 97 Cal. 147; *Reynolds* v. *Borel*, 86 Cal. 538; *Bartlett* v. *McGee*, (Cal.) 45 Pac. 1029.)

It appears from the opinion in the lower court, printed by respondent as part of his brief, that the trial judge, although conceding the title to be defective, was of the opinion that the plaintiff waived the defect by the recording of the deed. The learned judge in his opinion says that sending the deed to the

[1] 9 Am. St. Rep. 189.

insurance company and asking for a policy was equivalent to a direction to the company to place the deed of record. We do not think so. The plaintiff only sent the deed in answer to a request for a correct description of the land. He told the insurance company in the letter inclosing the deed to proceed with the examination of the title. If he had accepted the deed, he would not have then needed to have the title examined. In a subsequent letter to the insurance company he authorized them to draw upon him for the balance "as soon as the title should be examined and found to be clear and marketable." There is nothing in the acts or conduct of plaintiff that shows that he ever intended to take any other than a good and clear title.

We advise that the judgment be reversed and the court below directed to enter judgment for plaintiff as prayed for in his complaint.

Harrison, C., and Gray, C., concurred.

For the reasons given in the foregoing opinion the judgment appealed from is reversed and the court below directed to enter judgment for plaintiff as prayed for in his complaint.

Henshaw, J., McFarland, J., Lorigan, J.